No. 09-2542

DAVID FLICK,

Petitioner-Appellant,

v.

MILLICENT WARREN, Warden,

Respondent-Appellee.

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
The Honorable Marianne O. Battani

# PETITIONER-APPELLANT'S BRIEF

FEDERAL DEFENDER OFFICE
Legal Aid & Defender Assn., Inc.
Attorneys for Petitioner-Appellant

Andrew N. Wise
613 Abbott, 5th Floor
Detroit, MI 48226
Phone: (313) 967-5830

TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

STATEMENT IN SUPPORT OF ORAL ARGUMENT . . . . . . . . . . . . . . . . . . iv

FACT SHEET FOR HABEAS CORPUS APPEALS (28 U.S.C. § 2254) . . . . . . v

JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES PRESENTED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

ARGUMENT

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

I. MR. FLICK WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF TRIAL AND APPELLATE COUNSEL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. Where Trial Counsel Possessed Yet Failed to Investigate the Specific Studies Involving Experts with Experience in Cases Involving Child Deaths Resulting from Short Distance Falls, and Where Counsel Failed to Question the State's Experts or Use Such Studies in the Cross-examination of Said Experts, Counsel Provided Ineffective Assistance. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

B. If There Was No Reliable Data Concerning Shaken Baby Syndrome Prior to 2000, as the District Court Concedes, Then this Court must Concede That Counsel Was Ineffective for Failing to Seek Expert Advice to Mount a *Daubert* Style Challenge in Regard to the so-called Science Underpinning SBS. 23

C. Appellate Counsel's Failure to Raise the Aforementioned Issues on Direct Appeal Was Objectively Unreasonable and Prejudicial . 31

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

DESIGNATION OF APPENDIX CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . 33

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

CERTIFICATE OF COMPLIANCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

TABLE OF AUTHORITIES

Federal Cases


*Avery v. Alabama*, 308 U.S. 444 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Chambers v. Armontrout* , 907 F.2d 825(8th Cir. 1990) . . . . . . . . . . . . . . . . . . . . 16

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) . . 24, 25, 27

*Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 28

*Dugas v. Coplan*, 428 F.3d 317, 328 (l st Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 28

*General Electric Company v. Joiner*, 522 U.S. 136 (1997) . . . . . . . . . . . . . . . . 24

*Gideon v. Wainwright*, 372 U.S. 335 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . 31

*Kumho Tire Company, LTD. v. Carmichael*, 526 U.S. 137 (1999) . . . . . . . . . . . 24

*Lucas v. O'Dea*, 179 F.3d 412 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mapes v. Coyle*, 171 F.3d 408, 427-428 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . 31

*Mapes v. Tate*, 388 F.3d 187, 191 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*McFarland v. Yukins*, 356 F.3d 688 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . 13

*McKenzie v. Smith*, 326 F.3d 721 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 16

*Powell v. Alabama*, 287 U.S. 45 (1932) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Roe v. Flores-Ortega*, 528 U.S. 470,481(2000) . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007) . . . . . . . . . . . . . . . 21, 26

*Rompilla v. Beard*, 545 U.S. 374, 391; 125 S.Ct 2456 (2005) . . . . . . . . . . . 20, 21

*Stewart v. Wolfenbarger*, 468 F.3d 338 (6th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 16

*Strickland v. Washington*, 466 U.S. 668 (1984) . . . . . . . . . . . . 15,16,17,21,26,28

*Towns v. Smith*, 395 F.3d 251, 258(6th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . 28

*Wiggins v. Smith*, 539 U.S. 510, 527;123 S.Ct. 2527 (2003) . . . . . . . . . 20, 22, 28

*Williams v. Washington*, 59 F.3d 673 (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . 16

*Workman v. Tate*, 957 F.2d 1339, l346 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 22

Constitutional Provisions

U.S. Const. Am. V, VI, and XIV . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Other Authorities

"Head Injuries from Short Distance Falls," The American Journal of Forensic Medicine and Pathology, 13(1): 85-87 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Wheeler & Shope, "Depressed skull fracture in a 7-month-old who fell from bed", 100 Pediatrics 1033 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Tarlow, "Rico Report," The Champion, July 1999 . . . . . . . . . . . . . . . . . . . . . . . . 26

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

In accordance with the rules and procedure of the United States Court of Appeals for the Sixth Circuit, Petitioner-Appellant hereby formally requests oral argument in the instant appeal. This case presents substantial claims that Mr. Flick was denied his Sixth Amendment right to the effective assistance of trial and appellate counsel surrounding the handling of expert testimony regarding the cause of injury resulting in the death of David McBain. Oral argument is necessary to a full and fair clarification of the issues raised by the Petitioner-Appellant.

<u>FACT SHEET FOR HABEAS CORPUS APPEALS (28 U.S.C. § 2254)</u>

Case Name and Number: *David Flick v. Millicent Warren,* No. 09-2542

Person Reporting: Andrew N. Wise, Counsel for Mr. Flick.

1. Have these convictions been previously litigated in the United States Courts?

   No.

2. Constitutional violation claims:

   I. Mr. Flick was denied his Sixth Amendment right to the effective assistance of trial and appellate counsel.

   .

3. Have remedies been exhausted as to the claims listed above?

   Yes.

4. Are there fact disputes concerning claims?

   Yes. The district court held an evidentiary hearing.

5. Does the state argue that any constitutional violations, if found, were harmless beyond a reasonable doubt?

   No.

## JURISDICTIONAL STATEMENT

This is Petitioner David Flick's appeal of an Order and Judgment denying his Petition for a Writ of Habeas Corpus entered on November 5, 2009 (R. 65: Order Denying Petition, R.66: Judgment) On December 4, 2009, Mr. Flick filed a timely notice of Appeal. (R. 68: Notice of Appeal) The District Court granted a certificate of appealability on Mr. Flick's claims that he was denied the effective assistance of trial and appellate counsel and denied a certificate of appealability on the remaining claims. (R. 65 Opinion and Order denying Petition at p. 47). On March 31, 2011, this Court entered an Order denying a certificate of appealability as to the remaining claims.

Appellate jurisdiction arises pursuant to 28 U.S.C. § 2253.

## STATEMENT OF ISSUES PRESENTED

I.

MR. FLICK WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL COUNSEL FAILED TO CHALLENGE THE PROSECUTION'S THEORY THAT DAVID McBAIN'S DEATH COULD NOT HAVE BEEN THE RESULT OF A SHORT FALL WHERE SUCH WITNESSES WERE AVAILABLE AND A HEARING TO CHALLENGE THE BASIS FOR PROSECUTION'S WITNESSES OPINIONS WOULD HAVE REVEALED SERIOUS SCIENTIFIC FLAWS IN THOSE OPINIONS AND WHERE APPELLATE COUNSEL SIMILARLY FAILED TO CHALLENGE TRIAL COUNSEL'S PERFORMANCE.

A.

WHERE TRIAL COUNSEL POSSESSED YET FAILED TO INVESTIGATE THE SPECIFIC STUDIES INVOLVING EXPERTS WITH EXPERIENCE IN CASES INVOLVING CHILD DEATHS RESULTING FROM SHORT DISTANCE FALLS, AND WHERE COUNSEL FAILED TO QUESTION THE STATE'S EXPERTS OR USE SUCH STUDIES IN THE CROSS-EXAMINATION OF SAID EXPERTS, COUNSEL PROVIDED INEFFECTIVE ASSISTANCE.

IF THERE WAS NO RELIABLE DATA CONCERNING SHAKEN BABY SYNDROME PRIOR TO 2000, AS THE DISTRICT COURT CONCEDES, THEN THIS COURT MUST CONCEDE THAT COUNSEL WAS INEFFECTIVE FOR FAILING TO SEEK EXPERT ADVICE TO MOUNT A *DAUBERT* STYLE CHALLENGE IN REGARD TO THE SO-CALLED SCIENCE UNDERPINNING SBS

APPELLATE COUNSEL'S FAILURE TO RAISE THE AFOREMENTIONED ISSUES ON DIRECT APPEAL WAS OBJECTIVELY UNREASONABLE AND PREJUDICIAL.

## STATEMENT OF THE CASE

This is David Flick’s appeal of the district court's denial of his Petition for a Writ of Habeas Corpus. Mr. Lutze was convicted of second degree murder for the death of David McBain. He was sentenced to 30 to 75 years imprisonment on April 12, 1999.

Mr. Flick pursued a direct appeal to the Michigan Court of Appeals. On August 17, 2001, that Court issued an opinion affirming Mr. Flick’s conviction and sentence. (R. 38: State Court Record - Michigan Court of Appals Court Case No. 219434.) Mr. Flick then sought leave to appeal to the Michigan Supreme Court. The Michigan Supreme Court issued an order denying leave to appeal on March 22, 2002 (R. 35: State Court Record - Michigan Supreme Court Case No. 119996.)

Mr. Flick then sought post-conviction relief in the trial court. On March 18, 2003, Mr. Flick filed a Motion for Relief from Judgement under Michigan Court Rule 6.500 *et seq*. The trial court denied the Motion in an Opinion and Order issued on March 24, 2003 (R. 2: Appendix A-N re: Petition for Writ of Habeas Corpus, Appendix C, pp. 12-16.) Mr. Flick then sought leave to appeal from the Michigan Court of Appeals and was denied on August 20, 2004. (R. 36: State Court Record - Court of Appeals Case No. 254194.) He then sought leave to appeal from the Michigan Supreme Court, which denied his application on May 31, 2005. (R. 37: State Court Record -Michigan Supreme Court Case No. 127221.)

He filed his habeas petition on August 31, 2005. (R. 1: Petition for Writ of Habeas Corpus.) On January 28, 2008, the district court entered an Order granting an evidentiary hearing and appointing counsel. (R. 47: Order.) On November 21, 2008, the District Court held an evidentiary hearing. (R. 54: Transcript of Evidentiary Hearing.) Following the evidentiary hearing, Mr. Flick's trial and appellate counsel were deposed and supplemental briefs submitted to the district court. (R: 62 Supplemental Brief; R.63 Supplemental Brief; R. 64 Supplemental Brief.) On November 5, 2009, the district court entered an order denying the Petition and granting a certificate of appealability as to the claim of ineffective assistance of trial and appellate counsel. (R. 65: Opinion Order Denying Petition.) Mr. Flick then filed a timely notice of appeal. (R. 68: Notice of Appeal.) On March 31, 2011, this Court entered an order denying a certificate of appealability with respect to the remaining claims.

## STATEMENT OF THE FACTS

Mr. Flick is currently serving a 30 to 75 year sentence in the Michigan Department of Corrections following his conviction for second degree murder in connection with the death of 8-month-old David McBain. The factual background of the case was succinctly summarized by the Court as follows:

> David McBain was the son of Petitioner's live-in girlfriend, Tina McBain. Petitioner and Tina began dating one another when Tina was 3-4 months pregnant. During David's short life, Petitioner provided much of the day-to-day care of David. At the time of his death, Petitioner worked during the day and cared for David at night, while Tina went to work.
>
> According to the testimony adduced at trial, on May 8, 1998, Petitioner dropped Tina off at her job at approximately 4:00 p.m., and then took David home with him. At approximately 8:00 p.m., that evening, Petitioner banged on the door of a neighbor, William Jackson. Petitioner was holding David in his arms. The baby was limp and unresponsive and appeared to be unconscious. Jackson testified that Petitioner asked for help. Paramedics were called. David was airlifted from a local hospital to Bronson Hospital in Kalamazoo, Michigan. The following day, May 9, 1998, David was determined to be brain dead and was disconnected from life support. He died ten minutes later.
>
> Initially, Petitioner informed family members, paramedics, doctors, and police that David had fallen off a waterbed and that the family dog had jumped on his abdomen earlier in the day. About six weeks after David's death, Petitioner informed a counselor with whom he had established a relationship that on the day David was rushed to the hospital, contrary to what he had previously said, he dropped David from his arms onto a hardwood floor. David

> immediately began gasping for air. Petitioner explained that he had not told anyone previously that he dropped David because he was fearful.

(R. 47: Opinion and Order, p. 2.)

Mr. Flick was initially tried on October 27, 1998. That trial resulted in a hung jury. Mr. Flick's second trial began on February 16, 1999. On February 22, 1999, the jury returned a verdict of guilty on the charge of second-degree murder.

The prosecution's theory of the case was that David McBain died from injuries inflicted by Mr. Flick as a result of a repeated shaking combined with separate impacts and that Mr. Flick's version of events was not consistent with the medical evidence. The defense theory of the case was that David McBain suffered non-fatal accidental injuries and died as result of improper medical attention.

The medical testimony at trial came from the pathologist who performed the autopsy of David and the physicians at the hospitals who treated David. The defense did not present any medical testimony. Dr. Waldeman Palutke was the forensic pathologist who performed the autopsy of David McBain. Dr. Palutke's ultimate conclusion was that David died from "blunt force cranial cerebral injuries." (Transcript 2/16/99 at 333.) In response to cross-examination, Dr. Palutke agreed that the skull fractures he observed could have been caused by a fall from a height of 40 inches. *Id* at 309.)

The first doctor that saw David upon his arrival at Lakeland Hospital was Dr. Wayne Carlson. Dr. Carlson concluded from his observation of David that he was suffering from severe head injuries and needed to be transported to Bronson Hospital which had better facilities. *Id* at 477). David was transported to Bronson by air ambulance.

At Bronson, David was seen first by Dr. Mark Tagett, a vascular surgeon, and Dr. Robert Page, a pediatrician. Dr. Tagett testified that he quickly determined that there was nothing he could do to aid the treatment of David McBain. (Transcript 2/17/99 at 536.) When asked his opinion as to if a fall from an adult's arms would result in injuries like those suffered by David, Dr. Tagett answered no. He explained his opinion by stating "Because I've dropped my own kid like that. If he fell out of a treehouse onto a cement pavement right on top of his head, maybe." *Id* at 541.

Dr. Page observed retinal hemorrhages and this caused him to think of Shaken Baby Syndrome. Dr. Page explained the connection between retinal hemorrhages and Shaken Baby Syndrome as follows:

> What happens is then because the baby's head is proportionately larger than the body, this head and the neck muscles are very weak in babies, what happens is that this baby's head, the brain, is -- goes back and forth into the skull and there's shearing mechanisms that take place where the blood vessels then break off and that's what we're seeing with the retinal hemorrhages.

*Id* at 582. Dr. Page further opined that the injuries suffered by David McBain were the result of repetitive impact and shakes and that the skull fracture he observed was not consistent with an accidental fall. *Id* at 585.

Dr. Page called Dr. Mark Meyer the neurosurgeon on call. Upon his arrival at the hospital, Dr. Meyer consulted with Dr. Page, reviewed a CT scan taken at his request and conducted a neurological examination of David. Based on this, Dr. Meyer concluded that David was not likely to survive these injuries. *Id* at 630. Dr. Meyer testified that, in his opinion, that the injuries were not consistent with a head-first fall from as high as five feet. *Id* at 638. Dr. Meyer also testified to observing retinal hemorrhage in David and that retinal hemorrhage is almost by definition caused by shaking. *Id.* at 639. He concluded that in his opinion David was "shaken and then had his head impacted against a hard surface with considerable impact several times." *Id* at 643.

Dr. Stephen Higgins, an ophthalmologist, was asked to examine David's eyes to document any bleeding. He observed retinal hemorrhage in David's eyes. Dr. Higgins testified that the most common cause of retinal hemorrhage is Shaken Baby Syndrome. His explanation was that "it's a shearing mechanism by multiple back and forth movements or a very high velocity nature, if you will, it actually pulls on and tears the blood vessels." *Id* at 720. Dr. Higgins explained that the hemorrhages he observed required "multiple back and forth movements to create the shearing between

the blood vessels and the retina and the vitreous humor which is attacked [sic] to it."

*Id* at 727-728.

The final doctor to examine David was Dr. Daniel Fain, a pediatric neurologist. He was called to document David's brain death. Dr. Fain determined that David was brain dead. He offered the following explanation for the cause of death:

> My impression is that this child had suffered severe trauma by shaking, which then produced sheer injuries in the brain. When a baby's brain is shaken, different parts of the brain move at different speeds. What results is that the brain is more or less turned to mush in the process and that caused the injury, which caused the baby's death. [1]

*Id* at 746.

Dr. Fain opined that the injuries to David where fatal when they occurred, stating:

> "Nothing could have been done. It's analogous to cracking an egg into a bowl and taking a whisk to it. There's no way to make the yolk and the white separate out again. It's shaken. It's – it's nerve tissue that's damaged beyond repair."

*Id* at 753. In response to a question by one of the jurors as to whether brain swelling could cause retinal hemorrhage, Dr. Fain answered "No, it cannot. Mechanisms that produce brain swelling can also produce retinal hemorrhage, but the swelling alone cannot cause the hemorrhage." *Id* at 768.

---

[1] At the first trial, Dr. Fain testified that the cause of death was brain swelling which produced herniation. (Transcript 10/29/98 at 693.)

At the evidentiary hearing in this matter, Dr. Ronald Uscinski testified that based on his review of this case "I think [David McBain] died as a result of a fall, sustained a blunt head injury, and went into expiratory arrest shortly after that fall." (Transcript 11/21/2008 at 8.) Dr. Uscinski opined that a single fall from as little as 40 inches could have caused the skull fracture. *Id* at 35-36. Dr. Uscinski also explained that the impact from such a fall could be expected to cause a serious impairment to the functioning of the brain possibly resulting in change in respiratory patterns sufficient to cause an 8-month old to stop breathing. *Id* 36-37. If the brain were deprived of oxygen, cells would being to die and swelling would begin. Dr. Uscinski observed such swelling in the CT scans of David McBain. *Id* at 38. Such swelling could result in an increase in intracranial pressure and could produce retinal hemorrhage. *Id* at 38-44. Dr. Uscinski also explained that in his opinion the injuries to David McBain could not have been caused by shaking him. *Id* 52-60.

At his deposition, Mr. Flick's trial counsel, Robert McDowell, testified that in preparation for trial, he sent letters to two doctors, Laurence Simson and Werner Spitz. (Petitioner's Exhibit 14, Transcript of Deposition of McDowell p. 7.) He also consulted with Dr. Kris Sperry. *Id at 10.* (Petitioner's Exhibits 11, 12, and 13 are attached. Exhibit 11 is Mr. McDowell's letter to Dr. Simson. Exhibit 12 is his letter to Dr. Spitz. Exhibit 13 is Dr. Sperry letter to Mr. McDowell.) Mr. McDowell did not receive any written reports. He was able to find his notes from a call from Dr.

Sperry indicating that Dr. Sperry believed this to be "case of flagrant child abuse." *Id at 10.* Dr. Sperry had also spoken with Dr. Spitz about the case. Spitz apparently also believed the injuries to have been intentionally inflicted. *Id.* at 11. Although Mr. McDowell did include a reference to "studies done recently in regard to falls from shopping carts, which would be approximately 40", in which deaths were caused to toddlers" (Petitioner's Exhibit 12, p. 2) in his letter to Dr. Spitz, he could not recall what efforts if any he made to contact the authors of those studies. (Petitioner's Exhibit 14, p. 17-18.)

Mr. Flick's appellate counsel, Ronald Steinberg, testified that while he was working on Mr. Flick's case, he "was not aware of other experts who were disputing the scientific basis for this shaken baby syndrome." (Petitioner's Exhibit 15, Transcript of Deposition of Steinberg p. 8.) Mr. Steinberg testified that he was not aware of any dispute regarding the validity of Shaken Baby Syndrome until he was contacted by the undersigned counsel in connection with this case.[2] *Id.* at 10. Mr. Steinberg conceded that his generalized understanding of the state of Shaken Baby Syndrome was based upon prior cases that he had handled, not based on any particular research done for Mr. Flick's case. *Id* at 9.

[2] Mr. Steinberg suffered from a serious illness and stopped actively practicing law between the filing of the briefs in Mr. Flick's case and oral argument.

## SUMMARY OF THE ARGUMENT

Mr. Flick was convicted of the second degree murder of David McBain based upon the medical opinion testimony that David's injuries could not have been inflicted accidentially. Trial counsel was aware of and had available studies which indicated that injuries similar to those sustained by David could be caused by accidental short falls. Despite having this information, trial counsel failed to adequately investigate and call available expert witnesses to counter the prosecution's expert testimony. As such, Mr. Flick was deprived the effective assistance of trial counsel as guaranteed by the Sixth Amendment.

Alternatively, trial counsel should have mounted a challenge to the lack of scientific basis for the testimony offered by the prosecutions witnesses. Had trial counsel mounted such a challenge, the paucity of scientific evidence underlying so-called Shaken Baby Syndrome would have come to light and the result of the trial in this matter would have been different.

Finally, Mr. Flick was denied the effective assistance of appellate counsel, where appellate counsel failed to raise the above claims of ineffective assistance to trial counsel.

## ARGUMENT

STANDARD OF REVIEW

In the disposition of a habeas corpus petition, the district court's legal conclusions are reviewed *de novo* and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA):

> [A] writ of habeas corpus may only be granted if the state adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

*McFarland v. Yukins*, 356 F.3d 688, 713 (6th Cir. 2004).

### I.

MR. FLICK WAS DEPRIVED OF HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE HIS TRIAL COUNSEL FAILED TO CHALLENGE THE PROSECUTION'S THEORY THAT DAVID McBAIN'S DEATH COULD NOT HAVE BEEN THE RESULT OF A SHORT FALL WHERE SUCH WITNESSES WERE AVAILABLE AND A HEARING TO CHALLENGE THE BASIS FOR PROSECUTION'S WITNESSES OPINIONS WOULD HAVE REVEALED SERIOUS SCIENTIFIC FLAWS IN THOSE OPINIONS AND WHERE APPELLATE COUNSEL SIMILARLY FAILED TO CHALLENGE TRIAL COUNSEL'S PERFORMANCE.

The prosecution presented two theories in this case. The first was that David McBain's head was slammed against a hard surface causing his death. (R. 24: State Court Transcript of Proceedings held on 10/27/98 at 184-187; R. 25: State Court

Transcript of Proceedings held on 11/2/98 at 1083-4.) The second, presented at the second trial only, was that David was violently shaken to death. In support of the first theory, the prosecution presented the testimony of several physicians– most of whom had an interest in the outcome of the case[3]– who testified that David's head injuries were intentionally inflicted. (R. 31: State Court Transcripts of Proceedings held on 2/16/99 at 271-4, 281-3). In support of the second theory, the prosecutor presented the testimony of Dr. Daniel Fain who opined that David was shaken which caused severe shearing of the brain. (R. 33: State Court Transcripts of Proceedings held on 2/18/99 at 746).

In order to rebut the prosecution's theories, defense counsel offered only the testimony of family and friends of Mr. Flick. No evidence was presented by any witness familiar with Mr. Flick that suggested or hinted at abuse. To the contrary, the witnesses who knew Mr. Flick testified that he was "exceptionally good" in caring for David. No witness ever saw Mr. Flick strike David, David was never observed with any injuries while in Mr. Flick's care, nor did any witness ever harbor any suspicion that Mr. Flick mistreated David. The witnesses testified that Mr. Flick never got mad at David and that he always cared for and handled him in a very loving manner. (R. 34: State Court Transcript of 2/17/99 at 365-6, 372,387-9,392-3; R. 33: State Court

---

[3] In between trial, while Mr. Flick was on bond, Tina McBain initiated a medical malpractice investigation of the treatment of David while at Bronson Hospital. (R. 33: State Court Transcripts 2/18/99 at 858-9.)

Transcript of 2/18/99 at 894-6; R. 27: State Court Transcript of 2/19/99 at 1068-72, 1079, 1084, 1087-91, 1095, 1119-20; R. 32: State Court Transcript of 2/22/99 at 1209-10, 1252-3,1264-5,1286-7,1295-6,1305,1318.)

Trial counsel did not present any defense expert to refute the prosecution's case. Instead, defense counsel relied on the inconsistent testimony of the prosecution's experts. However, even though defense counsel adopted this strategy, counsel nevertheless failed to obtain any type of expert guidance and/or medical knowledge to either aid in the cross-examination of a speculative prosecution expert despite the absence of reliable data, or illicit testimony that called the lack of data into question in the jurors' minds.

The Fifth and Sixth Amendments guarantee criminal defendants the right to assistance of counsel in order to protect the most basic of rights – the right to a fair trial. U.S. Const. Am. V, VI, and XIV; *Powell v. Alabama*, 287 U.S. 45 (1932). The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversarial process. *Gideon v. Wainwright*, 372 U.S. 335, 343-344 (1963). It has long been recognized that the right to counsel encompasses the right to "effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Avery v. Alabama*, 308 U.S. 444, 445 (1940).

When a crime is allegedly committed against a minor, "courts must be vigilant in ensuring that the demands of due process are met," because the allegation "itself is

likely to inflame the passions of jurors." *McKenzie v. Smith*, 326 F.3d 721, 727-728 (6th Cir. 2003). The duty of defense counsel includes a duty to investigate and call witness. See *Stewart v. Wolfenbarger*, 468 F.3d 338, 357-358, 360 (6th Cir. 2006)(Failure to investigate and present witness who could have provided testimony impeaching key prosecution witness was prejudicial); *Williams v. Washington*, 59 F.3d 673, 683-684 (7th Cir. 1995)("Counsel's failure to use available tools to undermine [the key witness's] credibility resulted in prejudice" under *Strickland*); *Chambers v. Armontrout*, 907 F.2d 825, 830-831, 833-834 (8th Cir. 1990), *cert. denied*, 498 U.S. 950 (1990)(Counsel's decision not to interview and present witness that supported defendant's theory of defense constituted prejudicially deficient performance).

The Supreme Court established the *Strickland* test for ineffective assistance claims: the defendant must show that counsel's performance was deficient and created a "reasonable probability" that the result of the proceeding would have been different. *Strickland*, 466 U.S. at 694. The court warned against second-guessing reasoned tactics: "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." 466 U.S. at 694. However, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations

or to make a reasonable decision that makes particular investigations unnecessary." *Id*., at 690-691.

A.

> Where Trial Counsel Possessed Yet Failed to Investigate the Specific Studies Involving Experts with Experience in Cases Involving Child Deaths Resulting from Short Distance Falls, and Where Counsel Failed to Question the State's Experts or Use Such Studies in the Cross-examination of Said Experts, Counsel Provided Ineffective Assistance.

The district court relied heavily on the fact that trial counsel contacted three experts prior to the first trial. (R. 65: Opinion and Order, p. 26). However, on fact regarding trial counsel's performance has been ignored: at the time, trial counsel was aware of and possessed studies where children had fallen short distances and died. Despite of having this information available, he failed in his duty to seek out experts who could have testified to this information.

At his deposition, trial counsel stated that before the first trial he was aware of "studies done recently in regard to falls from shopping carts, which would be approximately 40 inches, in which deaths were caused to toddlers." Trial counsel also testified that he possessed some of those studies at the time of trial (R. 62-6: Supplemental Brief, Exhibit 14, Transcript of Deposition of Robert McDowell at 17-18.) Despite being aware of and possessing these studies, counsel failed in his duty to investigate the specific studies or contact the specific experts involved in those

studies. Counsel also failed to question the prosecution's experts about the specific studies, or use such studies in the cross-examination of those witnesses. Indeed, trial counsel admitted that testimony of a defense expert regarding the possibility of a 40" fall causing David's injuries would have been helpful to Petitioner's defense at trial *Id*. at 20.

This admission by trial counsel proves that he failed to adequately investigate and prepare a challenge to the prosecution's theories of Mr. Flick's guilt and warrants relief. At the time of trial, Mr. Flick had the ability to retain those specific experts to assist in his defense. *Id.* at 28-29.

Indeed, on post-conviction review, the Mr. Flick was able to locate and obtain the assistance of an expert who had documented experience in short distance falls resulting in child deaths and who had been involved in such studies– Ronald H. Uscinski, M.D. Dr. Uscinski testified at the evidentiary hearing that after reviewing all of the evidence in this case, i.e., the original CAT scans, ambulance reports, autopsy report and photos, and the information provided under oath by Petitioner that David fell from his arms to a hardwood floor, it was his opinion that "[a] fall from a distance even as little as 18 to 20 inches could cause [David's head injury]. A fall from a higher distance, 40 inches, would be very likely to cause this injury." Dr. Uscinski was also able to show that the fracture to David's skull was the result of a single impact. (R. 54: Transcript of Evidentiary Hearing 11/21/2008 at 35-36,75-76.)

Dr. Uscinski testified that "there is well-established literature out there ... that a fall of 18 inches in infant cadavers with less mass of the head resulted in fractures in ... the majority of infants." Id., at 76. See, e.g., "Head Injuries from Short Distance Falls", The American Journal of Forensic Medicine and Pathologv, 13(1): 85-87 (1992); Wheeler & Shope, “Depressed skull fracture in a 7-month-old who fell from bed”, 100 Pediatrics 1033 (1997).

Dr. Uscinski also disagreed with the prosecution's experts on their many theories. Ultimately, Dr. Uscinski found no evidence that David was shaken or beaten. (R. 54: Transcript of Evidentiary Hearing 11/21/2008 at 52-60.) He found David's injuries to be entirely consistent with the Petitioner's testimony that David received such injuries from an accidental fall. *Id*. at 8, 35-36.

At the evidentiary hearing Dr. Uscinski was also asked about the pathologist's findings. In response, Dr. Uscinski testified that even though there were three

separate skull bones broke, this does not mean that there were three separate impacts. He explained that the one impact could have caused the three broken bones because the pressure of the one impact to the back of the skull gets transmitted outward causing a fracture where the skull bends outward the most for that particular individual for the particular impact. The impact to the back of the skull in this case, Dr. Uscinski testified, created only one fracture line, which supports the theory of only one impact (R. 54: Transcript of Evidentiary Hearing 11/21/08 at 34-36, 44-48, 75-76.) Dr. Uscinski explained that "there is well-established literature out there" supporting his theory. *Id*., at 76. Had trial counsel investigated the specific studies involving fatal head injuries in children resulting from short distance falls, or made an effort to contact the specific experts involved in those studies, counsel would have been able disprove the pathologist's testimony.

Appellate review of trial counsel's investigation must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable lawyer to investigate further. *Rompilla v. Beard*, 545 U.S. 374, 391; 125 S.Ct 2456 (2005); *Wiggins v. Smith*, 539 U.S. 510, 527;123 S.Ct. 2527 (2003). In this regard Petitioner maintains that trial counsel was constitutionally ineffective.

Medical science is anything but ordinary. As such, one cannot expect every medical professional to be educated in every circumstance or have experience in every

head injury case. Similarly, one medical professional in a particular field cannot be said to have experience involving every available circumstance. One case may be similar to another in all but one critical aspect, a critical aspect that in-and-of-itself would cause for a completely different medical opinion.

Although the contacted experts did decline to accept the defense theory by offering the opinion that it was unlikely to receive a skull fracture from a short fall, they did not opine that it was impossible for a child to die from a short distance fall. Although at this time trial counsel possessed studies involving child deaths resulting from short distance falls, counsel failed in his duty to investigate the specific studies or contact the specific experts involved in those studies. To the contrary, counsel ceased his pursuit of an expert. Under these circumstances counsel's investigation was not a reasonable or adequate one, and was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). See, *Ramonez v. Berghuis*, 490 F.3d 482, 489 (6th Cir. 2007) (an assumption that witnesses will refuse to testify is an unreasonable substitute for actual investigation). *Rompilla*, at 375, 381. *Strickland* itself makes the point that "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-691.

In this case, the first *Strickland* prong is met. Counsel's investigation was deficient. The second prong is also met. There is a reasonable probability that an

adequate investigation would have produced a different outcome. It is hard to conceive that the jury would have convicted Petitioner had it heard the testimony of an expert who was able to provide testimony supporting the defense theory of accident.

Petitioner's case was therefore prejudiced where an expert such as the one the Petitioner now offers would have helped corroborate his defense and contradict the prosecution's witnesses. Counsel's default in carrying out his constitutional obligations resulted in this testimony not being introduced at trial. All it would have taken is for "one juror [to] have struck a different balance" between the competing stories. *Wiggins*, 539 U.S. at 537. See *Workman v. Tate*, 957 F.2d 1339, l346 (6th Cir. 1992).

The role of an expert witness is to use their "specialized knowledge" to "assist the trier of fact to understand the evidence or to determine a fact in issue." Michigan Rules of Evidence 702. Any juror's lack of knowledge regarding head injuries could have been explained to the jury in a different light had trial counsel obtained a defense expert who was experienced in short distance falls resulting in death-a defense expert not unlike Dr. Uscinski.

In this regard Petitioner has sufficiently shown that (1) at the time of his trials there existed well-established medical literature-and thus expert witnesses -regarding child deaths resulting from short distance falls; (2) that at the time of both trials trial

counsel was aware of and possessed such studies, yet failed to investigate the specific studies or contact the specific experts involved in those studies, (3) that although counsel possessed such studies at the time of both trials, counsel failed to use such studies in the cross-examination of the state's experts, or question them about said studies, (4) that counsel knew at the time of trial that the testimony of a defense expert regarding the possibility of a 40" fall causing David's injuries would have been helpful, yet he failed to search for such an expert with experience in this type of case.

For these reasons, this Court should grant a writ of habeas corpus.

B.

If There Was No Reliable Data Concerning Shaken Baby Syndrome Prior to 2000, as the District Court Concedes, Then this Court must Concede That Counsel Was Ineffective for Failing to Seek Expert Advice to Mount a *Daubert* Style Challenge in Regard to the So-called Science Underpinning SBS.

The District Court found that the science underlying Shaken Baby Syndrome did not become the subject of controversy that was widely known until after Petitioner's trial and appeal. The District Court thus found that trial counsel was not ineffective for failing to specifically seek an expert to testify regarding the controversy surrounding a Shaken Baby Syndrome Diagnosis. (R. 65: Opinion at 26-21.)

Petitioner submits that the District Court misinterpreted this aspect of Petitioner's claim. While Petitioner is challenging the effectiveness of his trial counsel

for counsel's failure to obtain an expert to testify regarding the controversy surrounding a Shaken Baby Diagnosis, Petitioner is also challenging trial counsel's failure to investigate the science underpinning Shaken Baby Syndrome for purposes of challenging the state's so-called experts under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Had counsel mounted such a defense, he at a minimum would have uncovered the serious flaws in the underpinning of Shaken Baby Syndrome. Even a cursory investigation would have alerted counsel that the whole Shaken Baby Syndrome theory was never based on any type of proven scientific methods in the first place, as proven by Dr. Uscinski's testimony.

At the evidentiary hearing Dr. Uscinski testified that David's injuries could not have been caused by shaking him. Dr. Uscinski explained that the first time that shaking a baby was ever proposed was as a hypothesis for explaining what to the questioner was unexplained intracranial bleeding in babies-this occurred in a 1971 article by a man named Guthkelch. After proposing shaking as a mechanism of injury, other authors joined in as well.

Dr. Uscinski explained that as a mechanical justification for shaking, these individuals based their theories on a 1968 article by Ommaya, who was working with the Department of Transportation regarding whiplash injuries in automotive safety. Based on the above, unexplained intracranial injuries in babies was thereafter deemed

to be the result of SBS. (R. 54 Transcript of Evidentiary Hearing 11/21/2008 at 52-53, 55- 56.)

As Dr. Uscinski testified, however, this theory was never investigated by these individuals to determine the intricacies involved or whether this was a scientifically logical conclusion. *Id*. at 56. Dr. Uscinski testified that in 1987 a biomedical engineer named Thibault decided to test the theory. Thibault took a model of an infant, attached an accelerometer on top to measure the accelerations, and had volunteers shake the infant in an attempt to reach the accelerations necessary to cross the injury threshold. They could not. No matter how hard they tried they did not come anywhere near the acceleration thresholds necessary to cause injury. *Id.* at 56-57.

Even at the time of Petitioner's trials prosecutor's were not allowed to just place any type of expert upon the stand to testify to any type of "unproven" or "untested" theory they chose. Rather, these theories had to be proven theories that were based upon reliable scientific evidence.

Since the Supreme Court's 1993 decision in *Daubert*, supra, and its progeny, *General Electric Company v. Joiner*, 522 U.S. 136 (1997); and *Kumho Tire Company, LTD. v. Carmichael*, 526 U.S. 137 (1999), criminal defense attorneys have been encouraged to attack the underlying methodology behind government proffered expert witnesses. The importance of post-*Daubert* challenges to government proffered

experts to criminal defense lawyers was set out in *The Champion*, the magazine of the National Association of Criminal Defense Lawyers as follows:

> Kuhmo appears to encourage "special briefing" or "other proceedings" when needed to investigate the expert's reliability. *See*, *Kuhmo*, 199 S.Ct. At 1176. This could present an important opportunity to challenge the "soft expert" testimony by pre-trial pleadings, or even where the challenge is unsuccessful, one may obtain a pre-trial hearing, where the expert is forced to elucidate his or her methodology and experience, subject to cross-examination. Certainly, this can only assist in terms of obtaining one's own expert to evaluate these conclusions or in preparing to investigate and cross-examine the witness at trial.

Barry Tarlow, *The Champion*, July 1999, "Rico Report."

Trial counsel's failure to investigate the science underpinning Shaken Baby Syndrome, or his failure to point out that there was no empirical data to be relied on in support of state's experts' opinions in the first place, was ineffective under *Strickland v. Washington*, 466 U.S. 668 (1984). *See also, Ramonez v. Berghuis*, 490 F.3d at 488.

At the deposition trial counsel admitted that although he consulted with doctors before the first trial as testimonial experts, he did not consider consulting with any such experts as consulting experts to assist him in the cross-examination of the prosecution's experts. (R. 62-7: Supplemental Brief Exhibit 15, Transcript Deposition of Robert McDowell at 14-15.) Nor did counsel consult with these experts with regards to any diagnosis of SBS.

If there was no reliable data concerning SBS prior to 2000-as the District Court found to be the case, (R. 65:Opinion and Order at 26-27)then this Court must concede that trial counsel was ineffective for failing to seek expert advice in this regard to either aid in the cross-examination of a speculative expert who testified for the state despite the absence of reliable data, OR illicit testimony that called the lack of data into question in the jurors' minds. At the time of trial there was simply insufficient facts or data regarding SBS for the prosecution's experts to even render an opinion. In this instance, had trial counsel conducted even a minimal investigation for literature that even suggested that such a theory had been generally accepted in the scientific community, counsel would have been helpless to find any. Indeed, such an investigation more likely than not would have led counsel to the studies conducted by Thibault, which Dr. Uscinski referred to in his testimony at the evidentiary hearing, or would have led counsel to realize that such theories were never actually even based on proven scientific methods in the first place. (R. 54: Transcript of Evidentiary Hearing 11/21/2008 at 56-57.)

Had counsel conducted even a minimal investigation regarding the underpinnings of SBS, counsel would have learned that there existed no empirical data to be relied on in support of the state's experts' opinions regarding SBS. With this counsel could have mounted a *Daubert* style challenge to the underpinning of SBS.

This conduct by trial counsel, or the lack thereof, was unreasonable and ineffective under *Strickland*. "The relevant question is not whether counsel's choices were strategic, but whether they were reasonable." *Roe v. Flores-Ortega*, 528 U.S. 470,481(2000) (emphasis added); accord *Towns v. Smith*, 395 F.3d 251, 258(6th Cir. 2005). "A purportedly strategic decision is not objectively reasonable 'when the attorney has failed to investigate his options and make a reasonable choice between them.'" *Towns*, 395 F.3d at 258 (quoting *Horton v. Zant*, 941 F.2d 1449,1462 (11th Cir. 1991).

The deference owed to counsel's strategic decisions is dependent upon the adequacy of the investigation underlying such decisions. *Wiggins*, at 521. The question is not whether counsel's failure to call an expert witness was unreasonable, but whether the investigation supporting the decision not to call an expert witness was itself reasonable. *Wiggins*, 539 U.S. at 523. "*Strickland* does not establish that a cursory investigation automatically justifies a tactical decision ... " *Id*., at 527. *See also*, *Dugas v. Coplan*, 428 F.3d 317, 328 (l st Cir. 2005) (holding that where defense counsel visually inspected the fire scene himself, talked with the state's experts, did some limited reading, and talked with other defense attorneys, he nonetheless failed to adequately investigate an available "no arson" defense); *Driscoll v. Delo*, 71 F.3d 701, 709 (8th Cir. 1995) (holding that even where defense counsel elicited a concession from the state's expert that whether a particular blood type was on a knife

was entirely speculative, defense counsel was defective for having failed to take measures "to understand the laboratory tests performed and the inferences that one could logically draw from the results" (all cited with approval in *Richey v. Bradshaw*. 498 F.3d 344, 363 (6th Cir.2007)).

Had the jury known that there existed no empirical data to be relied on in support of the state's experts' opinions regarding SBS it is reasonable to conclude that the outcome would have been different. Defense counsel's failure to even attempt to investigate the Science underpinning SBS was unreasonable and ineffective under *Strickland* where such an investigation would have shown that there was no empirical data to be relied on in support of state's experts' opinions regarding SBS. This ultimately left the jury with the impression that SBS was a proven and reliable scientific method, when in fact there existed absolutely no scientific evidence that it was.

Trial counsel's error of failing to obtain a defense expert left the whole "cause of death" issue and medical evidence unexplained, at least in a light favorable to Petitioner. Counsel's error is even more prejudicial in this case where the prosecution's experts could not agree on a cause of death, rendering four different opinions on the cause of death between the two trials. This failure impacted the ability of the jury to draw weight and credibility determinations about the circumstantial evidence presented. Indeed, counsel's lack of investigation in this case would have allowed-and

did allow-the State to provide a cause of death resulting from any type of medical theory they deemed appropriate at the time because defense counsel made absolutely no effort to test the so-called "expert theories" behind any of the State's so-called experts. Counsel's conduct is contrary to the mandates of *Strickland*.

Finally, the District Court found Dr. Uscinski's educational and professional experience to be impressive, his testimony relevant, and his conclusions the result of a careful review of David McBain's medical record. Similarly, the District Court found that the physicians who treated David following this traumatic injury also had impressive educational and professional experience. (R. 65: Opinion at 25-27.)

Petitioner, however, submits that where the District Court ultimately concluded that Dr. Uscinski's exculpatory testimony is simply insufficient in the face of this overwhelming testimony to persuade the Court that, in light of his new evidence, no juror, acting reasonably, would have voted to find Petitioner guilty beyond a reasonable doubt, the District Court erred by substituting its own decision for that of a jury. Petitioner reminds this Court that it was for the jury to decide what weight to be given to trial witnesses, not the District Court.

B.

Appellate Counsel's Failure to Raise the Aforementioned Issues on Direct Appeal Was Objectively Unreasonable and Prejudicial.

A defendant is entitled to the effective assistance of counsel in his first appeal of right. *Joshua v. DeWitt*, 341 F.3d 430, 441 (6th Cir. 2003). Appellate counsel's performance is judged under the same standard for evaluating trial counsel's performance found in *Strickland*. *Mapes v. Tate*, 388 F.3d 187, 191 (2004). Effective advocacy does not require an appellate attorney to raise every non-frivolous issue available. *Jones v. Barnes*, 463 U.S. 745 (1983). However, affording appellate counsel discretion as to which issues to pursue on appeal does not mean that all such decisions made by appellate counsel are beyond scrutiny. *Mapes v. Coyle*, 171 F.3d 408, 427-428 (6th Cir. 1999).

Mr. Flick's appellate counsel's performance was unreasonable in that he, like trial counsel, failed to recognize the availability of a challenge the prosecutor's use of expert testimony that David McBain's injuries could not have been the result of an accident.

*Strickland*'s prejudice prong is satisfied by the fact that had appellate counsel such a challenge in the context of ineffective assistance of counsel violations on appeal, there is a reasonable probability that the Michigan Court of Appeals would have determined that Mr. Flick was entitled to a new trial.

## CONCLUSION

Because Mr. Flick was denied his Sixth Amendment right to the effective assistance of trial and appellate counsel, this Court should grant the Writ of Habeas Corpus.

Respectfully submitted,

FEDERAL DEFENDER OFFICE

s/ANDREW N. WISE
ANDREW N. WISE
Attorney for David Flick
613 Abbott, 5th Floor Detroit, MI 48226
(313) 967-5542

Dated: June 16, 2011

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Case No. 09-2542

Case Caption: DAVID FLICK V. MILLICENT WARREN

## APPELLANT'S DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

Appellant designates the following documents in the District Court as items to be included in the record on this appeal:

| DESCRIPTION OF ENTRY | DATE | RECORD ENTRY NO. |
|---|---|---|
| PETITION | 8/31/2005 | R. 1 |
| APPENDIX A-N | 8/31/2005 | R. 2 |
| STATE COURT TRANSCRIPT 10/2798 | 6/21/06 | R. 24 |
| STATE COURT TRANSCRIPT 11/02/98 | 6/21/06 | R. 25 |
| STATE COURT TRANSCRIPT 4/12/99 | 6/21/06 | R. 26 |

| | | |
|---|---|---|
| STATE COURT TRANSCRIPT<br>2/12/98 | 6/21/06 | R. 27 |
| STATE COURT TRANSCRIPT<br>110/29/98 | 6/21/06 | R. 30 |
| STATE COURT TRANSCRIPT<br>2/16/99 | 6/21/06 | R. 31 |
| STATE COURT TRANSCRIPT<br>2/22/99 | 6/21/06 | R. 32 |
| STATE COURT TRANSCRIPT<br>2/18/99 | 6/21/06 | R. 33 |
| STATE COURT TRANSCRIPT<br>2/17/99 | 6/21/06 | R. 34 |
| STATE COURT TRANSCRIPT<br>Court Case. No. 119996 | 6/21/06 | R. 35 |
| STATE COURT TRANSCRIPT<br>Court Case No. 254194 | 6/21/06 | R. 36 |
| STATE COURT TRANSCRIPT<br>Court Case No. 127221 | 6/21/06 | R. 37 |
| STATE COURT TRANSCRIPT<br>Court Case No. 219434 | 6/21/06 | R. 38 |

| | | |
|---|---|---|
| ORDER | 1/29/08 | R. 47 |
| TRANSCRIPT<br>EVIDENTIARY HEARING<br>11/21/2008 | 12/16/08 | R. 54 |
| SUPPLEMENTAL BRIEF | 7/16/09 | R. 62 |
| SUPPLEMENT BRIEF | 9/11/09 | R. 63 |
| SUPPLEMENTAL BRIEF | 9/23/09 | R. 64 |
| OPINION and ORDER | 11/05/09 | R. 65 |
| JUDGMENT | 11/05/09 | R. 66 |
| NOTICE OF APPEAL | 12/04/09 | R. 68 |

Respectfully submitted,

s/Andrew N. Wise

Dated: June 16, 2011

Attorney for David Flick

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**NO. 09-2542**

**DAVID FLICK,**

Petitioner-Appellant,

v.

**MILLICENT WARREN,**

Respondent-Appellee.

______________________________________/

**Certificate of Service**

I certify that on June 17, 2011 the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users, or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record.

Federal Defender Office

/s Andrew N. Wise
E-mail: andrew_wise@fd.org
Attorney for Mr. Flick

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**NO. 09-2542**

**DAVID FLICK,**
Petitioner-Appellant,
v.
**MILLICENT WARREN,**
Respondent-Appellee.
_______________________________________________/

## Certificate of Compliance

Appellant hereby certifies that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), in that the word-processing system used to prepare the brief indicates that the brief contains 7999 words.

FEDERAL DEFENDER OFFICE

s/Andrew N. Wise
E-mail: andrew_wise@fd.org
Attorney for Mr. Flick