No. 09-2542

In the
UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

DAVID FLICK,

Petitioner-Appellant,

v.

MILLICENT WARREN,

Respondent-Appellee.

Appeal from the United States District Court
Eastern District of Michigan, Southern Division
Honorable Marianne O. Battani

# BRIEF FOR RESPONDENT -APPELLEE

Bill Schuette
Attorney General

John J. Bursch
Solicitor General
Co-Counsel of Record

Laura A. Cook
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Appellate Division
P.O. Box 30217
Lansing, MI 48909
517/373-4875

Dated: July 18, 2011

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT IN OPPOSITION TO ORAL ARGUMENT ................................. vi

JURISDICTIONAL STATEMENT .......................................................................1

STATEMENT OF ISSUES PRESENTED...............................................................2

STATEMENT OF THE CASE AND RELEVANT FACTS ...................................3

SUMMARY OF ARGUMENT ..........................................................................22

ARGUMENT .........................................................................................................25

I. Petitioner's first claim on appeal was never exhausted in the Michigan courts, nor presented in the District Court. Moreover, the claim was not certified for appellate review. Accordingly, the claim cannot be heard by this Court. ........25

A. Petitioner's argument was never exhausted in the Michigan courts, and because Petitioner would no longer have a remedy to do so, the claim is procedurally barred. ........................................................................25

B. Petitioner's argument was not asserted in his petition, nor was it certified for appellate review. Accordingly, it is barred from consideration by this Court. 27

C. Even if Petitioner's argument were properly before this Court, it is without merit where Petitioner cannot show that counsel – who consulted prior to trial with three renowned experts, all of whom agreed that the cause of the victim's death was not accidental – was deficient, or that but for counsel's error, the results at trial would have been different.........................................................29

II. In order to establish ineffective assistance of counsel, a petitioner must demonstrate both deficient performance and resulting prejudice. Here, Petitioner asserts that trial counsel was ineffective for failing to mount a *Daubert* challenge to the science underpinning Shaken Baby Syndrome at Petitioner's trial in 1999. Because Petitioner failed to present this claim on direct appeal, the argument is procedurally defaulted. Moreover, the claim is without merit in any case where

any challenge to the SBS testimony would have been pointless, and where Petitioner can show no resulting prejudice given that SBS was not the only theory as to how the child died at Petitioner's hands. To the contrary, other State witnesses testified that the child - who had approximately eleven injuries on his body, including a severe and lengthy fracture to his head - died as the result of blunt-force trauma. ....................38

A. Petitioner's claim is procedurally defaulted where he failed to assert it on direct appeal, and where Petitioner has not established sufficient cause to excuse the default nor shown a credible claim of actual innocence. ....................38

B. Petitioner's argument is without merit where trial counsel had no plausible basis upon which to mount a *Daubert* challenge, nor to present contrary testimony regarding SBS. Moreover, Petitioner was not prejudiced because the testimony regarding SBS was not the only theory of guilt. ....................47

CONCLUSION ....................55

ADDENDUM – DESIGNATION OF RECORD ON APPEAL ....................56

CERTIFICATE OF COMPLIANCE ....................58

PROOF OF SERVICE ....................59

## TABLE OF AUTHORITIES

Page

Cases

*Anderson v. Harless*,
459 U.S. 4 (1982) ....................................................................................26

*Bousley v. United States*,
523 U.S. 614 (1998) ..................................................................................46

*Burroughs v. Makowski*,
282 F.3d 410 (6th Cir. 2002) .....................................................................40

*Coleman v. Thompson*,
501 U.S. 722 (1991) ............................................................................ 27, 42

*Cone v. Bell*,
243 F.3d 961 (6th Cir. 2001) .....................................................................27

*Darr v. Burford*,
339 U.S. 200 (1950) ..................................................................................26

*Daubert v. Merrell Dow Pharmaceuticals, Inc*.,
509 U.S 579 (1993) ................................................................ 23, 47, 48, 49

*Dretke v. Haley*,
541 U.S. 386 (2004) ..................................................................................45

*Dunham v. United States*,
486 F.3d 931 (6th Cir. 2007) .....................................................................29

*Guilmette v. Howes*,
624 F.3d 286 (6th Cir. 2010) .....................................................................41

*Harrington v. Richter*,
562 U.S. ___; 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011) ..................................41

*Howard v. Bouchard*,
405 F.3d 459 (6th Cir. 2005) .....................................................................40

*Keeney v. Tamayo-Reyes*,
504 U.S. 1 (1982) ....................................................................................26

*Ludwig v. United States*,
162 F.3d 456 (6th Cir. 1998)........................................................................49

*McMeans v. Brigano*,
228 F.3d 674 (6th Cir. 2000)........................................................................43

*Murray v. Carrier*,
477 U.S. 478 (1986) ............................................................................ 42, 45

*People v. Dendel*,
481 Mich. 114 (2008)..................................................................................32

*Picard v. Connor*,
404 U.S. 270 (1971) ....................................................................................26

*Rose v. Lundy*,
455 U.S. 509 (1982) ....................................................................................26

*Schlup v. Delo*,
513 U.S. 298 (1995) ............................................................................ 45, 46

*Searcy v. Carter*,
246 F.3d 515 (6th Cir. 2001)........................................................................28

*Seymour v. Walker*,
224 F.3d 542 (6th Cir. 2000)........................................................................28

*Strickland v. Washington*,
466 U.S. 668 (1984) ....................................................................................42

*United States v. Cronic*,
466 US 648; 104 S Ct 2039; 80 L Ed 2d 657 (1984)..........................................30

*United States v. Pierce*,
62 F3d 818 (6th Cir. 1995)............................................................................30

*Vasquez v. Jones*,
486 F.3d 135 (6th Cir. 2007) ........................................................................40
*Willis v. Smith*,
351 F.3d 741 (6th Cir. 2003) ...................................................................... 39, 43

*Ylst v. Nunnemaker*,
501 U.S. 797 (1991) .................................................................................. 40, 41

Statutes

28 U.S.C. § 2253 ..............................................................................................1

28 U.S.C. § 2254 ..............................................................................................1

28 U.S.C. § 2254(b)(1)....................................................................................25

28 U.S.C. § 2254(c) ........................................................................................27

M.C.L 750.317 ..................................................................................................3

M.C.L. 769.12 ..................................................................................................3

Rules

Fed. R. App. P. Rule 34(a).................................................................................v

M.C.R. 6.500 ....................................................................................................40

M.C.R. 6.502(G)(1)..........................................................................................27

M.C.R. 6.508(D)(3)...................................................................... 39, 40, 41

M.C.R. 6.508(D)(3)(a) ......................................................................................39

M.C.R. 6.508(D)(3)(b) ......................................................................................39

M.R.E. 702 ................................................................................................ 48, 49

MCR 6.508(D) ...................................................................... 20, 39, 40, 41

## STATEMENT IN OPPOSITION TO ORAL ARGUMENT

Respondent-Appellee (Respondent), pursuant to Fed. R. App. P. Rule 34(a), opposes oral argument because the facts and legal arguments pertinent to the issues on appeal can be adequately presented to the Court in briefs submitted and without oral argument.

## JURISDICTIONAL STATEMENT

Petitioner David Flick, a state prisoner, commenced an action in the United States District Court for the Eastern District of Michigan, pursuant to 28 U.S.C. § 2254, by filing his petition for writ of habeas corpus on or about August 31, 2005. (R 1, Petition). On June 7, 2006, Respondent filed an answer to the petition. (R 16, Response). The District Court granted Petitioner's request for an evidentiary hearing, and hearings and depositions were held regarding whether trial and appellate counsel were ineffective, and whether Petitioner was actually innocent.

On November 5, 2009, the District Court issued an opinion denying the petition. (R 65, Order). The District Court issued a certificate of appealability with regard to one issue, namely, whether Petitioner was denied the effective assistance of trial and appellate counsel. (R 65, Order, p 47).

This Court has jurisdiction pursuant to 28 U.S.C. § 2253.

## STATEMENT OF ISSUES PRESENTED

I. Where an argument was never exhausted in the state courts, never presented to the District Court, and was not certified for appellate review, it cannot be asserted on appeal to this Court. Here, Petitioner asserts for the first time that trial counsel was ineffective for failing to investigate studies involving experts with experience in child deaths resulting in short falls. Is this argument properly before this Court?

II. In order to establish ineffective assistance of counsel, a petitioner must demonstrate both deficient performance and resulting prejudice. Here, Petitioner asserts that trial counsel was ineffective for failing to mount a *Daubert* challenge to the science underpinning Shaken Baby Syndrome at Petitioner's trial in 1999. Because Petitioner failed to assert this claim in his direct appeal, is it procedurally defaulted? Moreover, if the claim is not defaulted, is it without merit in any case where testimony regarding SBS was widely recognized and accepted in 1999, and where other experts for the State testified that the baby – who had approximately eleven injuries on his body, including a severe and lengthy fracture to his head – died as the result of blunt-force trauma to the skull?

## STATEMENT OF THE CASE AND RELEVANT FACTS

Following a jury trial in the Berrien County Circuit Court, Petitioner was convicted of second-degree murder (M.C.L 750.317) for the death of eight month-old David McBain, the son of Petitioner's fiancée. Petitioner was sentenced as a fourth habitual offender (M.C.L. 769.12) to a term of 30-to-75 years in prison.[1]

Statement of Facts

Testimony at trial established that on May 8, 1998, David McBain lived with his 17 year-old mother, Tina McBain, and Petitioner, her 22 year-old fiancée but not David's biological father (R 33, Trial Transcript (TT) 838-839; R 27, TT p 946; R 32, TT 1339). Whenever Petitioner got mad at the baby, he would hand him off to someone else (R 27, TT 1093-1094, 1097). At about 4 p.m. on the day in question, Petitioner dropped Ms. McBain off at Oh Solo Mio Restaurant, where she worked as a waitress (R 33, TT 841-842). Baby David, who was in good health, was in the back seat (R 33, TT 843-844).

At some point during the next few hours, while Petitioner was alone with him, David's head was slammed against a hard surface several times, and he was vigorously and repeatedly shaken (R 31, TT 272-273; R 34, TT 584, 637, 640, 643, 719-721, 727-728; R 33, TT 746-747; R 27, TT 975-979). At about 8 p.m., Petitioner banged on the door of his neighbors, William Jackson and his son,

[1] This was Petitioner's second trial, as his first trial resulted in a hung jury.

Aaron (R 34, TT 342, 377, 397, 441). Aaron opened the door, and Petitioner came in, holding David in his arms and saying, “Tell me what’s wrong with my baby” (R 34, TT 342-343, 377). The baby was limp and unresponsive, with his head rolling around and his arms hanging to the side, and he was having trouble breathing (R 34, TT 344-346, 377-378). Mr. Jackson knew something was drastically wrong and told Aaron to dial 911 (R 34, TT 345). When asked what happened, Petitioner explained that, about two or three hours earlier, he had laid the baby on the waterbed, gone to the bathroom, and, while there, heard a thump (R 34, TT 347). He came out and found David had fallen off the waterbed (R 34, TT 347, 379). The baby was fine for a while, but had become listless after he was fed, and Petitioner brought him over (R 34, TT 348). Petitioner also mentioned that the dog had jumped on the baby earlier, but offered no other explanations (R 34, TT 353, 357, 379, 382-383). Mr. Jackson noticed a bruise on the baby’s thigh that looked like a couple of finger marks (R 34, TT 352, 362).

Emergency medical technician Brenda Kenreich and her partner, Terry Germain, responded to the Jackson house, as did Officer William Farhat, a part-time paramedic (R 34, TT 394-399, 437-440). Both Farhat and Kenreich recognized that the baby was in critical condition (R 34, TT 403, 442-443, 447). He was pale, his breathing was very labored, and his head looked swollen and deformed (R 34, TT 403-404, 408, 446). Kenreich saw a red-colored mark on the

left side of the baby's head, and Farhat saw a little bruise off to the side of the head (R 34, TT 405, 435, 447). When Kenreich asked about the spot on the head, Petitioner said that the baby had fallen off a foot-high bed several hours earlier (R 34, TT 408-409, 445). Not believing that caused the baby's condition, Farhat asked, "Well, ... what caused this?" (R 34, TT 445). Petitioner said that a small dog had jumped off the couch onto the baby's stomach (R 34, TT 407, 445). When questioned further, Petitioner said it was a large dog (R 34, TT 407-408). Feeling no apparent abdominal injuries, Farhat said, "Well, that's not what caused this." (R 34, TT 445). Petitioner told Kenreich he ran to the neighbors because he had no phone, which was not true (R 34, TT 410; R 33, TT 794). When they were ready to leave for the hospital, Petitioner said he wanted to get the baby's mother (R 34, TT 450). Farhat said, "Well, no. I don't really want you to do that. I really need you to come with me . . . to the hospital." Petitioner said, "No, I really -- I'm going to get her." Farhat had never had that happen, and told Petitioner, "No, you have to come with us" (R 34, TT 450). Mr. Jackson then agreed to get the mother and bring her to the hospital (R 34, TT 451).

En route to Lakeland Hospital, David was close to death when his heart rate went down really low or stopped momentarily (R 34, TT 413, 451-452, 460-461, 468). Farhat noticed that the baby was "posturing" – movement exhibited by infants with serious brain injuries (R 34, TT 414, 453). Knowing that the baby's

condition was very life-threatening and beyond the means of the hospital's normal care, Farhat called Lakeland and suggested they call a helicopter down from Bronson Hospital (R 34, TT 456). Believing the injury was not the result of a fall from a bed, Farhat also asked the Sheriff's Department to contact Chikaming Township Officer Todd Hopke and have him come to the emergency room (R 34, TT 459; R 33, TT 785).

When the baby arrived in the emergency room at 9:19 p.m., his condition was grave, and Dr. Wayne Carlson felt palpable defects in the back of his head and observed bruising, mostly about the right eye and right side of the face (R 34, TT 475-476). Dr. Carlson explained that bruising develops over time, and minor bruises show up sooner than deeper ones (R 34, TT 481). The baby was unresponsive and making no purposeful movements, but was posturing, all indicating that he had severe head injuries (R 34, TT 476). Petitioner told Dr. Carlson that, at around six, the baby fell off the waterbed, but seemed okay, just slightly drowsy (R 34, TT 482-483). Petitioner also said that, while the baby was on the floor, a dog hopped off the couch, and one of its paws struck the baby's abdomen (R 34, TT 483). As the story was inconsistent with David's injuries, Dr. Carlson filed a report of suspected child abuse with protective services (R 34, TT 484).

After William Jackson arrived at the hospital with Ms. McBain, Petitioner told him that they were trying to blame it on him and were saying he had done something to the baby (R 34, TT 357). Ms. McBain asked what happened, but Petitioner said he did not know (R 33, TT 846-847).

When Officer Hopke arrived, Farhat told him the baby was near death and suggested questioning Petitioner, as the condition was not caused by falling off a bed (R 34, TT 471-472). Petitioner told Hopke that at about 6 p.m., Petitioner put David on the waterbed in his bedroom, went into the bathroom, and heard a thud (R 33, TT 789-790). Petitioner found David lying face down on the floor, but he seemed okay (R 33, TT 790-791). A little later, Petitioner went back to his father's house in an unsuccessful attempt to find someone to babysit for him (R 33, TT 791-792). According to Petitioner, he went back home and put David, who was acting tired, on the living room floor to play. The dog jumped on the baby's stomach, but he seemed okay after that (R 33, TT 791-792). A little later, David started breathing abnormally, and after that, his body went limp (R 33, TT 792, 821). Petitioner thought he was choking, so he patted David on the back. (R 33, TT 792, 821).

The helicopter left for Bronson at about 9:55 p.m., and during the trip, flight nurse Robert Mayberry identified bruises above and around David's right eye, right cheek, and left side of the abdomen (R 34, TT 485, 497-498, 503). The baby

was unresponsive except for posturing that Mayberry saw at Lakeland and at Bronson, where they arrived at about 10:19 p.m. (R 34, TT 501, 513).

When trauma surgeon Mark Tagett heard about David's injuries and that he fell off a waterbed, he was suspicious, as that mechanism of injury would not cause seizures and posturing (R 34, TT 521). After the baby's arrival, Dr. Tagett observed that both sides of his head, especially the left, were swollen (R 34, TT 531). The baby was also welty, both his cheeks were raised, swollen and red, and he had a bruise just under his right nipple (R 34, TT 528, 530). Dr. Tagett thought at the time that David was brain dead and that nothing could be done to save him (R 34, TT 533, 551). And Dr. Tagett did not believe the baby's injuries could have been caused by a fall from an 18-inch high waterbed, a dog jumping on his abdomen, a fall out of a person's arms, or running into a door (R 34, TT 540-542).

According to Dr. Page, who first saw David at about 10:30 p.m., the baby arrived in critical condition, with no spontaneous respirations, some posturing but no purposeful movement, and some bruising on the face (R 34, TT 563, 567, 575, 586-587). The history, a fall from a waterbed, did not fit the baby's condition (R 34, TT 571). A CT scan done at about 11:30 p.m. showed three skull fractures, one with a portion of bone slightly pushed into the brain, but no obvious intracranial pathology, such as bleeding, swelling, or a tumor (R 34, TT 571, 588; R 33, TT 668-669). In an infant, the appearance of the brain has greater

variability, making diagnosis more difficult (R 33, TT 670). David was transferred to the pediatric intensive care unit at about 1:30 a.m. (R 34, TT 573, 590-591). Although critical, David was stabilized at some point after the first CT scan (R 34, TT 595, 601).

According to Tina McBain, Dr. Page told her David was stable and that he was coming home in two weeks (R 33, TT 899). At some point, Petitioner told McBain the baby had fallen off the bed and that their dog had jumped on him (R 33, TT 847-848, 852).

After David's transfer to intensive care, Petitioner told Dr. Page the baby was well until about 6 p.m., when he fell off the waterbed (R 34, TT 572-574). He was fine for the next couple hours, although at one point the dog jumped off the couch and brushed him (R 34, TT 572). Shortly after feeding him a bottle, Petitioner heard gurgling sounds, and David was limp, pale, and gasping for air (R 34, TT 572-573). Petitioner took him outside, but the baby alternated between gasping and not breathing. When nothing helped, Petitioner rushed to the neighbors' (R 34, TT 572-573). Petitioner never told Dr. Page that he had dropped the baby on its head or accidentally hit the baby's head on the door (R 34, TT 574).

At that time, Dr. Page thought they had a non-survivable baby, as David had no basic neurological reaction: he was not breathing and had no reflexes other than basic spinal reflex action (R 34, TT 575-576). Dr. Page contacted neurosurgeon

Mark Meyer, who asked Page to order seizure medication and get another CT scan, which was done at about 3:20 a.m. (R 34, TT 578, 614-615; R 33, V670). The scan showed some generalized swelling of the brain (R 34, TT 579). Dr. Page also saw retinal hemorrhages, indicative of Shaken Baby Syndrome, resulting from vigorous, intentional shaking, which causes the brain to go back and forth in the skull, causing the blood vessels to break off (R 34, TT 581-582). Retinal hemorrhage would not be seen in a baby who fell from a bed or a person's arms, because it is caused by repetitive acceleration and deceleration in a fixed area (R 34, TT 583-584). Dr. Page also had never seen skull fractures, even from car accidents, as massive as those sustained by David (R 34, TT 582-583). Such fractures would not result from a 40-inch fall (R 34, TT 585-586). Dr. Page believed two things had occurred: a shaking and an impact against something to cause the skull fracture (R 34, TT 584).

Dr. Meyer's initial understanding was that David was unresponsive, posturing, and somewhat hemodynamically unstable (R 34, TT 617). In addition, David had developed fixed and dilated pupils, which could have resulted from either a sudden and dramatic increase in intracranial pressure or a herniation syndrome (R 34, TT 620-621). Dr. Meyer observed bruises underneath David's right chin, on his right cheek, under and above his right eye, on his forehead, on the back of his head, and above his ear (R 34, TT 623-625). In the first CT scan,

Dr. Meyer saw diffuse edema at both cerebral hemispheres; the second was worse, with more marked swelling and some small hemorrhages scattered through the brain (R 34, TT 621, 628-630; R 33, TT 671, 692). Dr. Meyer felt that David's prognosis was extremely poor, he would probably not survive, and he was either in a very deep coma or already brain dead (R 34, TT 630). Based on what he had observed, as well as the CT scan, Dr. Meyer thought David was shaken repeatedly and had his head impacted against a hard, flat surface with considerable force several times (R 34, TT 637, 643). David could have either become unconscious immediately or entered a semi-lucid state (R 34, TT 637, 643). The three areas of blunt force trauma would not be expected from a fall from an 18 inch high waterbed or a person running into a door with the baby, and his injuries would not have been from a five-foot, head first fall onto the floor (R 34, TT 638-640). Shaking the head enough to cause retinal hemorrhage results in shear-type injury and can cause death (R 34, TT 641).

When Drs. Meyer and Page examined the baby, they both felt he was non-survivable (R 34, TT 579). At about 4:00 or 4:30 a m , they told the family that David had suffered massive, severe, intentional head injury, was in a very deep coma, and was not going to survive (R 34, TT 579, 643-635; R 33, TT, 905-906). Ms. McBain basically said, "I don't care what you f (sic) doctors say. My baby's going to make it;" she left the room quickly, with Petitioner following her (R 34,

TT 579, 635; (R 333, TT 906). Ms. McBain confronted Petitioner, who said he did not shake the baby (R 33, TT 855-856).

At about 4:20 a.m., Officer Hopke talked to Drs. Page and Meyer and took photographs of David, who had bruises on his face (R 33, TT 797-799).

At midday on May 9, 1998, ophthalmologist Stephen Higgins was consulted on David's possible brain death (R 34, TT 716-718). In addition to many bruises on the baby's body, Dr. Higgins saw very severe bleeding in both his retina and vitreous humor, the material inside of the eye (R 34, TT 719, 723). The most common cause of such extensive hemorrhaging is Shaken Baby Syndrome, caused by multiple, violent, and rapid back and forth movements (R 34, TT 719-721, 727-728). Dr. Higgins would not have expected any retinal hemorrhage in a baby who fell off a waterbed or who was held by someone who ran into a door; he would have expected only a very small amount in a baby who had a dog jump on his stomach, who fell on his head from someone's arms, who was held by a person who ran up to 60 yards, who experienced all of the above, or who had CPR performed on him (R 34, TT 722-726, 730-731, 735). Even a baby in a car accident or one who fell 12 feet headfirst would not have the degree of retinal hemorrhage David had (R 34, TT 721-722, 727, 729). According to Dr. Higgins, David died from brain swelling (R 34, TT 733).

Dr. Daniel Fain, a pediatric neurologist, also was called in to determine whether David was brain dead and should be taken off life support (R 33, TT 737, 741). David had bumps with swelling of the scalp on both sides of his head, as well as bruises on his face, abdomen, and legs (R 33, TT 738, 741). The EEG taken that morning indicated no brain activity whatsoever (R 33, TT 740). Dr. Fain found no evidence of normal eye movement and no mid-brain and brain stem cranial nerve activity (R 33, TT 740-741). He saw extensive retinal hemorrhage on both sides. (R 33, TT 740-741). Dr. Fain determined that David was brain dead and that no further support was warranted (R 33, TT 745-746). According to Dr. Fain, David died from severe trauma caused by prolonged, severe shaking, which caused severe shear injury, not herniation, where pressure in the brain forces it down into the brain stem (R 33, TT 746-747, 751-752). The severe shaking tore the nerve tissue of the brain apart (R 33, TT 752). Dr. Fain stated the mechanism of death in his report as Shaken Baby Syndrome, which is by definition a shear injury (R 33, TT 757). For brain shearing, there is no recourse; nothing could have been done for David after the fatal injury occurred (R 33, TT 752-754). Even if David had fallen off an 18-inch high waterbed, had a dog jump on his stomach, fallen out of a person’s arms landing on his head on a hardwood floor, banged his head into a door, been carried by a person running across a field, and been given

CPR, Dr. Fain absolutely would not expect the injury he saw here (R 33, TT 752-753).

Later that evening, life support was terminated through legal procedures, and David was pronounced dead about 10 minutes later (R 33, TT 749-750).

On May 10, 1998, Officer Hopke videotaped McBain's house (R 33, TT 800-801, 804). However, Petitioner had never told Hopke he had dropped David onto the floor near the crib (R 33, TT 803-804). The videotape showed a rug on the floor next to the crib, but the rug was gone in a later photo (R 33, TT 807, 817-818).

On May 11, 1998, forensic pathologist Waldeman Palutke performed the autopsy on David (R 31, TT 247, 255). Dr. Palutke saw several bruises of the right knee area, several bruises above the left knee, an abrasion on the right lower front chest wall, several more bruises at the base of the jaw on both sides, a large bruise on the bottom of the left side of the jaw, a bruise on the left cheek, a small bruise on the left forehead, several bruises on the right side of the face, a cluster of bruises on the right side of the forehead, and a large bruise above and one under the right eye (R 31, TT 260-264, 273-274). The skull was also extensively bruised, and there were severe, blunt force injuries on both sides of David's head (R 31, TT 272-273). A baby sustaining such injuries would have become unconscious very rapidly, if not immediately (R 31, TT 285). The large number and kind of injuries

Dr. Palutke found were inconsistent with a fall on the head from an 18 inch high waterbed onto a hard floor, a dog jumping onto the child's abdomen, a fall out of a person's arms onto its head on the floor, or a baby striking its head on a door, either alone or in combination (R 31, TT 284-285, 286-288, 291). The doctor did not see cerebral edema or swelling, but it would be difficult to see in an infant unless quite profound, and treatment may have reversed the swelling by the time the baby died (R 31, TT 305-306, 318). According to Dr. Palutke, the cause of David's death was blunt force injuries of the head and brain (R 31, TT 286, 333).

On September 10, 1998, Petitioner finally told Ms. McBain that, while holding David with one arm and reaching into the crib with the other, he had dropped the baby, who fell backwards directly onto his head (R 33, TT 852-853, 882, 912). At trial, Ms. McBain noted that she had already started a lawsuit against the hospital (R 33, TT 858-859), that she did not believe anything the doctors said, and that she did not think Petitioner killed David (R 33, TT 854, 861).

Petitioner testified that on the date in question, he had dropped Ms. McBain off at work and then, along with David, went to a friend's home but the friend was not there (R 32, TT 1356, 1359). Petitioner and David arrived back at their home between 6:00 and 7:00 p.m., at which time the baby was behaving fine (R 32, TT 1360-1361). Petitioner testified that he placed David on the waterbed in the bedroom, and that he had done so in the past but had never previously left the room

when doing so (R 32, TT 1362). Petitioner then went to use the restroom – around the corner from the bedroom – and heard a "thud noise" and David crying because he had fallen off the bed (R 32, TT 1362). Petitioner picked up the baby, who was crying but was fine and did not appear to have any bruises (R 32, TT 1363). David eventually stopped crying, so Petitioner put him on the floor in the living room so Petitioner could do the dishes. David crawled into the kitchen as Petitioner finished the dishes, and Petitioner picked him up and set him back on the floor as Petitioner read a newspaper (R 32, TT 1363-1364). At that point, the dog jumped on the couch and Petitioner shoved the dog because the couch was new, and the dog landed on David (R 32, TT 1365). David did not cry, and did not appear to have any injuries. Petitioner pulled the baby up onto the couch and then packed some things and they went to Petitioner's father's home (R 32, TT 1365-1366).

Petitioner testified that when he arrived to his father's home, he wanted to see if his sister could babysit, at which point his father said he would babysit if Petitioner's sister did not get home on time (R 32, TT 1366). Petitioner went back home and packed up some of the baby's things and loaded them into the car, along with David (R 32, TT 1367). Petitioner testified that he forgot the baby's rattle, so he went back inside and "that's when David fell out of my arms" (R 32, TT 1368). Petitioner stated that he was standing over the crib to reach the toy, with the baby in his right arm, when David made a "humping" motion like he did to pull himself

up, at which time the baby went to the floor. Petitioner was unable to catch the baby with his left hand because his left hand was inside the crib (R 32, TT 1370). The baby fell straight to the ground and hit his head, but did not cry or make any movement. The baby was breathing, but gasping for air (R 32, TT 1371). Petitioner took the baby into the living room and laid him on the floor and tried CPR, although he had no idea how to do it. Petitioner testified that he put his hands on the baby's chest and pushed down so he would breathe, and then breathed into the baby's mouth, at which time David "puked up formula" into Petitioner's mouth, but started breathing again normally (R 32, TT 1372). Petitioner sat the baby up and patted him on the back, and the baby spit up more formula, "acknowledged [Petitioner] for a few seconds and then he quit breathing again" (R 32, TT 1372).

Petitioner picked up the baby and went to run to the back door, "and that's when I - - I kicked the door and it didn't open" and David hit again his head, this time on the door (R 32, TT 1373). Petitioner ran outside and laid the baby on the cement to try CPR again, but the baby had a seizure and started shaking and throwing up formula (R 32, TT 1373-1374). Petitioner testified that he went to his neighbors' home because the neighbor was going to school for some medical training (R 32, TT 1374). Petitioner stated that he told the Jacksons and the paramedics that the baby fell off the bed, but he did not tell the Jacksons the baby

hit the door on the way out because it "was a very brief conversation" (R 32, TT 1376). When Officer Farhat asked Petitioner what had happened, Petitioner told him he fell off the bed (R 32, TT 1377). Petitioner also told Dr. Carlson that the baby fell off the bed, and Petitioner did not recall if he told him that David hit his head on the door (R 32, TT 1379-1380). When Petitioner spoke to Officer Hopke at the hospital, Petitioner "told him the same thing I told everyone else. I told him that he fell off the bed" and also told him the dog jumped on the baby. (R 32, TT 1381-1382).

Petitioner testified that he never observed the baby "posturing" at any point, nor did he observe any bruises to the baby's head other than a bruise over the eye that Petitioner believed was from the door (R 32, TT 1385-1386). Petitioner testified that the first person he told about the baby falling out of his arms was his friend "Al" just after the baby died (R 32, TT 1394).[2] Petitioner stated that he never told Ms. McBain or the police or the medical personnel, but he told Al, because he did not know what to do and did not want to tell Ms. McBain (R 32, TT 1395; 1422). Petitioner spoke to his counselor, Ms. McDonald, and did tell her about the other mishaps that befell the victim, but that conversation occurred after the preliminary examination, during which Petitioner heard testimony regarding three areas of blunt-force trauma to David's head (R 32, TT 1401-1402, 1424).

[2] Petitioner's friend Al Newell died a week after Petitioner is alleged to have spoken with him (R 21, TT 1423).

Defense witnesses testified that the McBain's and Campbell's, Petitioner's mother's family, were very supportive of Petitioner and that nobody in the Flick family wanted anything to happen to him and were sticking together (R 27, TT 1081-1082, 1138). Other witnesses confirmed seeing Petitioner and David, who was acting normal, at some point before 6 p.m. on May 8 (R 27, TT 1035, 1038, 1046-1049, 1057-1060).

According to John McBain, the baby's maternal grandfather, he observed no injuries on David, only a few bruises (R 32, TT 1258, 1275-1276). Mr. McBain testified that he believed Petitioner and blamed the doctors for the baby's death (R 32, TT 1273, 1276). Carol Greene, the baby's maternal grandmother, saw only one little bruise on the baby's cheekbone, a tiny bruise on his rib, and a tiny bruise on his back (R 32, TT 1291). A nurse at the hospital pointed out different marks on the baby's body and tried to tell Greene that David was an abused baby, but Greene told her it was diaper rash (R 32, TT 1291, 1308).

Procedural History

Petitioner, represented by appellate counsel, filed an appeal of right in the Michigan Court of Appeals, raising five claims. Petitioner asserted three additional claims in a pro per brief submitted to the Court. The Court of Appeals affirmed Petitioner's conviction. (R 38, Michigan Court of Appeals No. 219434

(August 17, 2001)). The Michigan Supreme Court denied leave to appeal on the same issues. (R 35, Michigan Supreme Court No. 119996 (March 22, 2002)).

On March 10, 2003 Petitioner filed a motion for relief from judgment in the trial court asserting eight claims. On March 24, 2003 the trial court denied relief. Petitioner sought leave to appeal, which was denied by the Court of Appeals and the Supreme Court on the basis of MCR 6.508(D). (R 36, Michigan Court of Appeals Opinion No. 254194 (August 20, 2004); R 37, Michigan Supreme Court Opinion No. 127221 (May 31, 2005)).

In the District Court, Petitioner sought habeas corpus review of fourteen claims. On September 17, 2007, Petitioner moved for an evidentiary hearing and for the appointment of appellate counsel. (R 42, Motion; R 44, Motion). On January 29, 2008, the District Court appointed counsel for Petitioner and also granted the motion for an evidentiary hearing. (R 47, Order). Pursuant to the District Court's order, the evidentiary hearings consisted of: (1) a November 21, 2008 hearing before the Court where the testimony of Dr. Ronald Uscinski was received (R 54, Hearing Transcript (HT) 11/21/08); (2) a February 27, 2009 deposition in the office of Robert McDowell, Petitioner's trial counsel (R 62, Supplemental Brief, Attachment 6, HT 02/27/09); and (3) a June 11, 2009 deposition in the office of Ronald Steinberg, Petitioner's appellate counsel (R 62, Supplemental Brief, Attachment 7, HT 06/11/09).

After both parties filed post-hearing briefs concerning the issues of ineffective assistance of counsel and actual innocence (R 62, Supplemental Brief; R 63, Supplemental Brief; R 64, Supplemental Reply Brief), the District Court denied the petition on November 5, 2009. (R 65, Opinion).

## SUMMARY OF ARGUMENT

Petitioner asserts that trial counsel provided ineffective assistance for the following reasons: (1) counsel possessed, yet failed to investigate, specific studies involving experts with experience in cases involving child deaths resulting from short-distance falls, and counsel failed to question the State's experts or use such studies in the cross-examination of such experts; and (2) counsel failed to seek expert advice to mount a *Daubert*[3]-style challenge in regard to the science underpinning Shaken Baby Syndrome (SBS). Petitioner also asserts that appellate counsel was ineffective for failing to assert these issues on direct appeal.

Petitioner's claim that trial counsel was ineffective for failing to utilize studies involving child deaths from short falls was never presented to the State courts, nor ever asserted in the District Court or certified for appeal to this Court. Accordingly, the argument is not only procedurally defaulted, but cannot be considered by this Court because "a court of appeals will address only the issues which are specified in the certificate of appealability."[4] Here, the certificate of appealability authorized Petitioner to pursue an appeal for ineffective assistance as it related to the issues contained in the petition. Petitioner relies upon information that unquestionably resulted from trial counsel's federal deposition to then posit a

---

[3] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S 579 (1993).
[4] *Searcy v. Carter*, 246 F.3d 515, 518 (6th Cir. 2001); see also *Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000); *Dunham v. United States*, 486 F.3d 931, 934-35 (6th Cir. 2007).

new theory of ineffective assistance. Petitioner never moved to amend his petition to include the new argument, and, remarkably, did not even include the argument in his post-hearing brief to the District Court. Petitioner's first claim, therefore, cannot be considered by this Court.

With regard to whether trial counsel was ineffective for failing to mount a *Daubert* challenge to the science underpinning the diagnosis of SBS, Petitioner must show that: (1) counsel's performance fell below the objective standard of reasonableness and so prejudiced Petitioner that he was denied a fair trial; and (2) a reasonable probability exists that, but for counsel's conduct, the result at trial would have been different.[5] Petitioner cannot demonstrate that counsel was deficient where it would have been pointless for counsel to challenge the introduction of SBS testimony where such testimony was widely regarded and admissible at the time of Petitioner's 1999. Petitioner cannot demonstrate prejudice because even if testimony regarding SBS had been excluded or challenged by an expert, SBS was not the sole theory of guilt. The prosecution's focus was also on the approximate eleven injuries found on the victim's body, the severe and lengthy fatal fracture to the baby's head, and Petitioner's own statements after the child's death that were wholly inconsistent with his claim of innocence. Accordingly, Petitioner cannot show a reasonable probability that but for counsel's

[5] *Strickland v. Washington*, 466 U.S. 668, 669, 694 (1984).

failure to challenge the science of SBS, the results at trial would have been different.

The District Court's decision to deny habeas relief in this case should be affirmed.

## ARGUMENT

**I. Petitioner's first claim on appeal was never exhausted in the Michigan courts, nor presented in the District Court. Moreover, the claim was not certified for appellate review. Accordingly, the claim cannot be heard by this Court.**

Petitioner asserts that trial counsel was ineffective for failing to investigate studies counsel possessed regarding child deaths resulting from short-distance falls, or to use such information to cross-examine the State's expert witnesses. Petitioner never raised this claim in the Michigan courts either on direct review, or in his motion for relief from judgment. Moreover, he did not assert the argument in his petition, or in his post-hearing brief to the District Court following the evidentiary hearing at which the subject of the argument was discovered. Finally, the claim was not certified for appeal to this Court. For these reasons, the argument cannot be considered by this Court.

**A. Petitioner's argument was never exhausted in the Michigan courts, and because Petitioner would no longer have a remedy to do so, the claim is procedurally barred.**

A habeas petitioner is required to fairly present all of his habeas claims to the state courts before presenting them in federal court in a habeas action.[6] The purpose of the exhaustion rule is to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal court, and to "protect the state courts' role in the enforcement of federal

---

[6] 28 U.S.C. § 2254(b)(1).

law."[7] The exhaustion doctrine is more than a "procedural hurdle," and "[e]xhaustion means more than notice."[8] To exhaust, a petitioner "must have fairly presented the substance of his claim to the state courts." This means the claim *and* it's supporting factual allegations.[9] "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made."[10] The petitioner bears the burden of proving that he has either exhausted his state remedies prior to filing his federal petition, or that he satisfies an exception to the exhaustion requirement.[11]

Here, although Petitioner did raise claims on direct appeal and in his motion for relief from judgment alleging that trial counsel was ineffective, he never asserted that counsel was ineffective for failing to utilize studies in counsel's possession regarding short falls involving children. This theory of ineffective assistance was clearly never presented to the Michigan courts, but instead stemmed solely from the deposition of trial counsel during discovery in the District Court. As Petitioner specifically argues: "At his deposition, trial counsel stated that before the first trial he was aware of 'studies done recently in regard to falls from shopping carts, which would be approximately 40 inches, in which deaths were

---

[7] *Rose v. Lundy*, 455 U.S. 509, 518 (1982).
[8] *Keeney v. Tamayo-Reyes,* 504 U.S. 1, 9 (1982).
[9] *Picard v. Connor,* 404 U.S. 270, 276 (1971); *Tamayo-Reyes,* 504 U.S. at 9-10.
[10] *Anderson v. Harless,* 459 U.S. 4, 6 (1982).
[11] *Darr v. Burford,* 339 U.S. 200, 218-19 (1950).

caused to toddlers.' Trial counsel also testified that he possessed some of those studies at the time of trial." (Petitioner's Brief, p 17).

Indeed, Petitioner's claim is not merely unexhausted, but is in fact procedurally defaulted. "If the claims presented in the federal court were never actually presented in the state courts, but a state procedural rule now prohibits the state court from considering them, the claims are considered exhausted, but are procedurally barred."[12] Under Michigan law, a defendant may file only one motion for relief from judgment per conviction.[13] Because Petitioner has already filed a motion for relief from judgment, he no longer has an available state court remedy.[14] Consequently, his claims are exhausted, but procedurally barred.

**B. Petitioner's argument was not asserted in his petition, nor was it certified for appellate review. Accordingly, it is barred from consideration by this Court.**

Not only did Petitioner fail to present his claim to the Michigan courts, he also never asserted the claim in the District Court. As noted, Petitioner's argument is based on testimony provided by trial counsel in his federal deposition. Petitioner never sought to amend the petition to include the argument, nor did he separately present the argument in his post-hearing briefs to the District Court. Finally,

---

[12] *Cone v. Bell*, 243 F.3d 961, 967 (6th Cir. 2001) (citing *Coleman v. Thompson*, 501 U.S. 722, 752-53 (1991).
[13] See M.C.R. 6.502(G)(1).
[14] See 28 U.S.C. § 2254(c).

because the issue was never presented to, nor addressed by, the District Court, the claim cannot be considered part of the District Court's certificate of appealability.

This Court has long stated that issues not certified for appeal cannot be considered by this Court.[15] In *Dunham v. United States*,[16] the petitioner's certificate of appealability authorized him to pursue an appeal for ineffective assistance of counsel as it related to a sentencing claim. When Dunham attempted to expand his ineffective-assistance claim by including arguments beyond the sentencing issue, the Court rejected his attempts.

Here, the District Court *did* certify for appeal the issue of ineffective assistance, but the ineffective assistance claims identified by the Court alleged that counsel failed to: (1) request a mistrial or a continuance when Dr. Fain's testimony changed; (2) retain an expert to highlight the lack of scientific support for SBS; (3) investigate Dr. Palutke's testimony, which may have supported Petitioner's claim that the baby's injuries resulted from a fall from Petitioner's arms rather than from shaking; (4) request an instruction on the intent to injure form of involuntary manslaughter; (5) request the correct accident instructions; and (6) correctly inform Petitioner that he was entitled to an expert witness at public expense. (R 65, Order,

[15] *Searcy v. Carter*, 246 F.3d 515, 518 (6th Cir. 2001); *Seymour v. Walker*, 224 F.3d 542, 561 (6th Cir. 2000); *Dunham v. United States*, 486 F.3d 931, 934-35 (6th Cir. 2007).
[16] *Dunham*, 486 F.3d at 934-35.

p 14). With the exception of the second of these arguments, Petitioner has failed to brief any of the other claims to this Court, and instead creates a wholly new one.

As in *Dunham* – where the certified issue was ineffective assistance of counsel but the petitioner was not authorized to raise other instances of ineffective assistance – Petitioner in the present case is not authorized to raise other arguments concerning ineffective assistance that were not presented to the District Court, much less to the Michigan courts. This Court must not reach the merits of Petitioner's claim because it is beyond the scope of the certificate of appealability.

**C. Even if Petitioner's argument were properly before this Court, it is without merit where Petitioner cannot show that counsel – who consulted prior to trial with three renowned experts, all of whom agreed that the cause of the victim's death was not accidental – was deficient, or that but for counsel's error, the results at trial would have been different.**

Even if the merits of this claim are considered by this Court, Petitioner would not be entitled to habeas relief. To establish ineffective assistance of counsel under Federal constitutional standards, Petitioner must demonstrate that (1) counsel's performance fell below the objective standard of reasonableness and so prejudiced Petitioner that he was denied a fair trial and (2) a reasonable probability exists that, but for counsel's conduct, the result would have been different.[17] Petitioner must show that counsel made errors so serious that he was

[17] *Strickland*, 466 U.S. at 669, 694.

not functioning as the "counsel" guaranteed by the Sixth Amendment.[18] The court presumes that counsel is competent, and the burden is on Petitioner to demonstrate a constitutional violation.[19]

Importantly, a court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."[20] And a petitioner bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.[21]

Here, the District Court's finding – that trial counsel's "decision against a continued investigation was a reasonable one" because he "discontinued his investigation only after three witnesses failed to provide him with any analysis favorable to the defense" – would likewise have defeated the present argument that was not asserted to the Court. (R 65, Order, p 26). The record makes clear that counsel conducted a thorough pretrial investigation and went to great lengths to attempt to secure an expert favorable to the defense.

Trial counsel – Mr. McDowell – testified that he has been a trial attorney since 1967, and that criminal defense cases have comprised the majority of his

[18] *Strickland*, 466 U.S. at 687.
[19] *United States v. Pierce*, 62 F3d 818, 833 (6th Cir. 1995) (citing *United States v. Cronic*, 466 US 648, 658; 104 S Ct 2039, 2046; 80 L Ed 2d 657 (1984)).
[20] *Strickland*, 466 U.S. at 689.
[21] *Strickland*, 466 U.S. at 689.

caseload in his career. (R 62, Supplemental Brief, Attachment 6, HT 02/27/09, p 21). Mr. McDowell thoroughly prepared for Petitioner's trial, as demonstrated by the fact that he presented 16 defense witnesses on his client's behalf, and given his thorough cross-examination of the prosecution's witnesses. Most importantly, and contrary to Petitioner's assertions prior to the evidentiary hearings, counsel in advance of trial consulted with not one, not two, but with three renown medical experts in an effort to retain their services and testimony at trial. But because each of these otherwise "defense-friendly" experts could not, having reviewed the records, testify in Petitioner's favor, trial counsel made the sound strategic decision not to call them.

After Petitioner's preliminary examination, defense counsel contacted the experts in an effort to obtain their assistance in countering the prosecution's theory at preliminary exam that the victim's skull injury was similar to that of a fall from a two-story building. (R 62, Supplemental Brief, Attachment 6, HT 02/27/09, pp 7-11; Attachment 3, 07/07/98 Letter from trial counsel to Dr. Laurence Simson; Attachment 4, 09/15/98 Letter from trial counsel to Dr. Spitz; Attachment 5, 11/15/98 Letter from Dr. Sperry to trial counsel). Each of the three experts – Dr. Simson, Dr. Spitz, and Dr. Sperry – are nationally renowned and have testified on behalf of defendant's facing criminal charges.

Dr. Simson is a specialist in the practice of forensic pathology who was professor of pathology at Michigan State University, an Ingham County pathologist, and a national consultant in forensic pathology to the Surgeon General of the United States Air Force.[22] Counsel also contacted Dr. Spitz, a forensic pathologist, toxicology consultant, and professor of pathology at the Wayne State University School of Medicine. Dr. Spitz has served as medical examiner for Wayne and Macomb counties, and has also testified for the defense in many high-profile criminal cases. For example, in the murder trial involving Phil Spector, Dr. Spitz testified on behalf of the defense that the victim in that case shot herself.[23] And Dr. Spitz is testified for the defense in the recent trial of Casey Anthony in response to the allegation that Ms. Anthony killed her daughter.[24]

With regard to Dr. Kris Sperry, counsel took the time to consult this out-of-state expert from Georgia in an effort to obtain his assistance for the defense. Dr. Sperry is chief medical examiner for the State of Georgia who nonetheless will testify on behalf of defendant's facing criminal charges. For example, Dr. Sperry

---

[22] *People v. Dendel*, 481 Mich. 114, 121 (footnote 7) (2008); R 62, Supplemental Brief, Attachment 6, HT 02/27/09, pp 7-11, Petitioner’s Deposition Exhibit 11, 07//7/98 letter to Dr. Simson.

[23] Washington Post, July 25, 2007 (this link can be found at www.washingtonpost.com/wp-dyn/content/article/2007/07/25/AR2007072500490.html).

[24] The Christian Science Monitor, June 19, 2011 (this link can be found at www.csmonitor.com/USA/Justice/2011/0619/Casey-Anthony-trial-Witness-refutes-duct-tape-as-murder-weapon).

testified *against his employer*, the State of Georgia in a 2003 case where a young man stood accused of shaking a toddler to death. The defendant in that case was alone babysitting a two-year old child who stopped breathing. The defendant was arrested for the child's death, and the prosecution proceeded on a theory that the child had been shaken to death. At trial, Dr. Sperry testified for the defense and stated that shaking is extremely rare as a cause of severe brain injury or death in children older than 6 months, and that the child in question did not die as a result of severe shaking.[25]

Despite the inclination of all three experts to testify on behalf of defendants, none of them, having viewed the transcripts and records sent to them, could testify on Petitioner's behalf in this case. Even Dr. Sperry, who clearly has no hesitation to refute SBS findings, could not assist Petitioner because, as he stated in his letter to defense counsel, "unfortunately I agree with the other pathologists who had looked at the case, and after showing it to the other 3 pathologists in my office, with no other information other than the autopsy and the photographs, they also agreed that this child *died of inflicted injuries*." (R 62, Supplemental Brief, Attachment 5, 11/15/98 Letter from Dr. Sperry to trial counsel).

Petitioner cannot meet his burden of demonstrating that counsel was ineffective where counsel clearly consulted multiple, and highly regarded, experts

---

[25] May 7, 2003 CBS News entry (this article can be found at www.cbsnews.com/stories/2003/03/13/48hours/main543929.shtml).

in the field but could not utilize them at trial given their inability to testify on Petitioner's behalf. Petitioner's new argument – that counsel was ineffective for failing to utilize reports concerning child deaths resulting from short-distance falls – does not warrant habeas relief in light of the thorough measures counsel took to find an expert for the defense. Indeed, Petitioner cannot even establish that trial counsel failed to contact the authors of the studies at issue, given counsel's testimony at his deposition that he could not recall whether he did so or not.[26] (R 62, Supplemental Brief, Attachment 6, HT 02/27/09, pp 17-18).

What is clear is that counsel discussed such reports with at least one expert, Dr. Spitz. In trial counsel's letter to Dr. Spitz wherein counsel was seeking Dr. Spitz's assistance, counsel specifically referenced recent studies where falls from shopping carts resulted in the death of toddlers. (R 62, Supplemental Brief, Attachment 4, 09/15/98 Letter from trial counsel to Dr. Spitz, p 2). Had Dr. Spitz agreed with such studies, or more importantly felt that in the present case the baby's injuries and death could have resulted from a short-distance fall, it must be presumed that he would have testified for the defense at trial. Instead, as with the other three experts contacted by counsel, Dr. Spitz was unable to assist the defense given the injuries to the child and the conclusion that the baby's death was not the

[26] The fact that counsel at trial *did* cross-examine Dr. Palutke as to whether the baby's skull fracture could have been caused by a fall of approximately 40 inches – to which Dr. Palutke responded that it was possible – establishes that counsel utilized information regarding short-distance falls. (R 33, TT 309).

result of an accident. Trial counsel's letter to Dr. Spitz verifies that he was not deficient for failing to utilize information regarding short-distance falls where counsel clearly discussed such data with Dr. Spitz.[27] Nor can Petitioner show that counsel's representation resulted in any prejudice, where despite bringing such data to the attention of Dr. Spitz, the expert was not willing or able to testify in accordance with such studies.

Petitioner cannot show a reasonable probability that the results at trial would have been different had counsel presented information regarding child deaths resulting from short falls. This is particularly true where Petitioner himself strayed from his original story that the baby must have been injured by falling off the waterbed or when the dog landed on the child. Once Petitioner took the stand in his own defense and suddenly reported two more instances of trauma to the child – namely, when the child "jumped" out of Petitioner's arms and landed on the floor head-first, and when Petitioner accidentally banged the baby's head on the back door of the home as Petitioner ran for help – the potential weight of any evidence regarding falls from short distances was diminished. Given the extensive injuries to the baby, and testimony from State witnesses that the child died as the result of

[27] The fact that counsel ad trial *did* cross-examine Dr. Palutke as to whether the baby's skull fracture could have been caused by a fall of approximately 40 inches – to which Dr. Palutke responded that it was possible – further establishes that counsel utilized information regarding short-distance falls. (R 33, TT 309).

blunt-force trauma, the jury could reasonably conclude that the baby died at Petitioner's hands. That is, even if an expert had testified that the child's head injury could have resulted from a short-distance fall, the jury also heard Petitioner's change in stories and testimony from several witness as to numerous injuries to the child. No amount of testimony from a defense expert could have overcome the fact that Petitioner's behavior and his ever evolving explanations of how the baby came to be so bruised and injured were overwhelmingly incriminating in and of themselves.

In view of the medical testimony at trial, the jury was unlikely to be convinced that the baby's death resulted from a short fall. The testimony of Drs. Meyer, Page, Palutke, and Higgins established that the baby had both been violently and repeatedly shaken and that his head had been slammed at least twice against a hard surface with considerable impact. (R 31, TT pp 272-274; R 34, TT pp 582-584, 637, 643; R 33, TT pp 718-722, 727-729). He sustained three skull fractures, one of which was depressed, with bone slightly pushed into his brain. (R 34, TT pp 571, 588, 668-669). Moreover, the baby was in critical condition and near death from the outset, when the paramedics first saw him. (R 34, TT pp 403, 413, 447, 460-461). Already at that point, the child's head looked swollen and deformed, and his posturing signaled major brain injury.

Under these circumstances, there was no reasonable probability that the result at trial would have been different even if trial counsel had presented testimony regarding short falls resulting in the death of a child.

## II. In order to establish ineffective assistance of counsel, a petitioner must demonstrate both deficient performance and resulting prejudice. Here, Petitioner asserts that trial counsel was ineffective for failing to mount a *Daubert* challenge to the science underpinning Shaken Baby Syndrome at Petitioner's trial in 1999. Because Petitioner failed to present this claim on direct appeal, the argument is procedurally defaulted. Moreover, the claim is without merit in any case where any challenge to the SBS testimony would have been pointless, and where Petitioner can show no resulting prejudice given that SBS was not the only theory as to how the child died at Petitioner's hands. To the contrary, other State witnesses testified that the child - who had approximately eleven injuries on his body, including a severe and lengthy fracture to his head - died as the result of blunt-force trauma.

Petitioner alleges that trial counsel was ineffective for failing to mount a *Dauber*-type challenge to the science underpinning Shaken Baby Syndrome in order to challenge the SBS testimony presented at trial. Because Petitioner failed to assert this claim on direct appeal, it is procedurally defaulted. Moreover, the argument is without merit in any case because counsel was not deficient in failing to challenge SBS testimony that was widely accepted at the time of trial, and Petitioner cannot establish prejudice where SBS was not the only theory as to Petitioner's culpability in the child's death.

### A. Petitioner's claim is procedurally defaulted where he failed to assert it on direct appeal, and where Petitioner has not established sufficient cause to excuse the default nor shown a credible claim of actual innocence.

On direct appeal, Petitioner failed to assert that trial counsel was ineffective with regard to the SBS testimony presented at trial. This argument was first asserted in Petitioner's motion for relief from judgment and subsequent appeals, in

the context that counsel should have requested a continuance once Dr. Fain's testimony at the second trial changed to include a diagnosis of SBS, so that an expert to refute such testimony could be secured.

Both state appellate courts in this case denied Petitioner relief with respect to his claim by using language stating that the appeal was denied "because defendant has failed to meet the burden of establishing entitlement to relief under M.C.R. 6.508(D)." A habeas petitioner defaults a claim if the following three conditions are shown: (1) the petitioner fails to comply with a state procedural rule; (2) the state courts enforce the rule; and (3) the state procedural rule is an adequate and independent state ground for denying review of a federal constitutional claim.[28]

In this case, Petitioner failed to comply with the first two conditions. He failed to comply with a state procedural bar – M.C.R. 6.508(D)(3). Further, the state courts enforced the procedural bar, as evidenced by the trial court's specific citation to "M.C.R. 6.508(D)(3)(a) and (b)" and consideration of whether Petitioner demonstrated cause, prejudice, or actual innocence. (R 36, Michigan Court of Appeals No. 254194, March 24, 2003 Circuit Court Opinion, pp 3-4).

It was once well-established in this Court that simply citing to M.C.R. 6.508(D) constituted an adequate and independent ground on which the Michigan Supreme Court could rely in foreclosing review of federal claims. In *Burroughs v.*

---

[28] *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003).

*Makowski,*[29] for example, a panel of this court considered the form order used by the state appellate courts here and found that it presented a sufficient explanation that the ruling was based on the failure to comply with a state procedural rule.[30]

However, this changed with the Court's opinion in *Guilmette v. Howes.* In *Guilmette,* this Court held that Michigan's appellate court orders from an appeal of a trial court's denial from a petitioner's motion for relief from judgment filed pursuant to M.C.R. 6.500 et seq. – that denied the motion because of failure to meet the burden of establishing the entitlement to relief under M.C.R. 6.508(D) – were "ambiguous as to whether they refer to procedural default or denial of relief on the merits . . . ." As such, the Court held that such orders were "unexplained."[31]

The Supreme Court has held that, where the last state court decision is ambiguous as to its reasons for not granting relief, the federal court on habeas review is to "look through" that decision to the last reasoned order from the state courts. It is then presumed that the subsequent ambiguous orders rested on the same grounds.[32]

In this case, as noted, the trial court denied Petitioner's claims in his motion for relief from judgment citing M.C.R. 6.508(D)(3). Thus, the state courts'

---

[29] *Burroughs v. Makowski*, 282 F.3d 410, 413-414 (6th Cir. 2002).
[30] *See also Howard v. Bouchard*, 405 F.3d 459, 477 (6th Cir. 2005).
[31] *Guilmette v. Howes*, 624 F.3d 286, 291(6th Cir. 2010).
[32] *Ylst v. Nunnemaker,* 501 U.S. 797 (1991). *See also Vasquez v. Jones,* 486 F.3d 135, 141 (6th Cir. 2007).

reliance on M.C.R. 6.508(D)(3) was an adequate and independent state ground for denying review of his federal constitutional claims.

The Supreme Court's recent decision in *Harrington v. Richter*[33] does not affect this analysis. In *Richter*, the Supreme Court held that "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."[34] The Court further stated, citing the "look through" principle of its opinion in *Ylst*, that "[t]he presumption may be overcome when there is reason to think some other explanation for the state court's decision is more likely."[35]

Thus, the state court appellate orders citing "M.C.R. 6.508(D)" in this case, which this Court held in *Guilmette* were unexplained, are presumed to be the result of review on the merits. However, that presumption may be overcome by looking through to the lower trial court order and determining the basis for its decision. Where – as here – a lower court decision explicitly imposes a procedural default, the federal courts must presume that a later decision rejecting the claim did not silently disregard that bar and consider the merits.[36]

---

[33] *Harrington v. Richter*, 562 U.S. ___, ___; 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011).
[34] *Richter*, 178 L. Ed. 2d at 639.
[35] *Richter*, 178 L. Ed. 2d at 639, citing *Ylst*, 501 U.S. at 803.
[36] *Ylst*, 501 U.S. at 803.

Where a state court denies relief on independent and adequate state procedural grounds, as the state courts did here, a prisoner may only obtain habeas review of such claims if he can establish "cause and prejudice" or that the failure to review his claims would result in a "fundamental miscarriage of justice."[37] In order to establish "cause," to excuse his default, a habeas petitioner must establish that some objective factor external to his defense prevented him from complying with the state procedural rule.[38]

Petitioner asserts ineffective assistance of appellate counsel to excuse his default of the claim. In order for attorney error to constitute cause, it must rise to the level of ineffective assistance of counsel under the standard of *Strickland*; namely, Petitioner must establish that appellate counsel's performance was deficient, and that the deficient performance prejudiced the defense.[39] Petitioner is unable to establish either point because, as the District Court noted in rejecting Petitioner's ineffective-assistance claim regarding appellate counsel, "Petitioner has failed to show that any of these claims were meritorious. Therefore, he has not shown that he was prejudiced by appellate counsel's failure to raise them." (R 65, Opinion, p 43). As discussed more fully in the following section, because trial

---

[37] *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).
[38] *Murray v. Carrier*, 477 U.S. 478 (1986).
[39] *Strickland*, 466 U.S. at 687.

counsel was not ineffective with regard to failing to challenge the SBS testimony, appellate counsel could not have been ineffective for failing to assert such a claim.

Petitioner has failed to show a reasonable probability that, but for appellate counsel's failure to present the SBS argument on direct appeal, the result of the appeal would have been different. Where a claim is not a "dead bang winner," appellate counsel's failure to raise it on direct appeal cannot constitute cause to excuse procedural default.[40] Petitioner's habeas claim is not a "dead bang winner," and "[a]ppellate counsel cannot be ineffective for a failure to raise an issue that lacks merit."[41]

The following findings by the District Court, with regard to whether appellate counsel provided effective assistance, accurately convey the thorough measures employed by counsel during the direct appeal, and demonstrate that appellate counsel was not deficient:

> Next, Petitioner alleges that counsel was also ineffective in failing to request a continuance or to retain an investigator following the change in Dr. Fain's expert opinion. Respondent argues that this claim is procedurally defaulted.
>
> * * *
>
> Petitioner's appellate attorney was deposed on June 11, 2009, in connection with Petitioner's habeas petition. He testified that, in preparing Petitioner's appeal, he focused on examining the differences between the first trial, which resulted in a hung jury (two jurors would

[40] See *McMeans v. Brigano*, 228 F.3d 674 (6th Cir. 2000).
[41] *Willis v. Smith*, 351 F.3d 741, 744 (6th Cir. 2003).

have voted for acquittal and ten jurors would have voted for involuntary manslaughter), and the second trial. Appellate counsel focused on the fact that Dr. Fain's testimony changed from the first trial to the second. Appellate counsel explained that he raised a claim that trial counsel was ineffective in failing to obtain a transcript of the first trial or replay the video testimony which was available at the time. Appellate counsel was not asked during the deposition whether he considered raising a claim on appeal that counsel was ineffective in failing to request a continuance to retain an expert regarding Dr. Fain's changed testimony.

Correspondence between Petitioner and appellate counsel both before and after the appellate brief was filed shows that appellate counsel's decision as to which issues to raise on direct appeal was the result of careful and informed consideration. Appellate counsel's deposition testimony shows that he carefully reviewed the record and recognized the importance of Dr. Fain's testimony. Petitioner was given an opportunity to develop a factual record in this Court regarding his ineffective assistance of counsel claims. He failed to develop a factual record which would rebut the presumption that his attorney's decision not to raise this claim was a reasoned, strategic one. *Poindexter v. Mitchell*, 454 F.3d 564, 585 (6th Cir. 2006) (holding that appellate counsel was not ineffective in failing to raise a claim on appeal where petitioner failed to present any facts that would "lend particular importance" to the unraised claim). Importantly, while Dr. Fain's testimony changed from the first to the second trials, a critical aspect of his testimony was consistent from the first trial to the second. In the first trial, Dr. Fain testified that David's injuries were consistent with Shaken Baby Syndrome and inconsistent with a fall from an 18-inch bed or a fall from someone's arms. In the second trial, Dr. Fain also testified that David's injuries were consistent with Shaken Baby Syndrome and inconsistent with the other accidents Petitioner recounted. Thus, trial counsel's failure to request a continuance to obtain an expert when critical testimony of Dr. Fain's remained consistent, is not an issue that appellate counsel was ineffective in failing to raise.

[R 65, Opinion, pp 17, 22-23].

When a petitioner fails to establish cause and prejudice for a procedural default, relief may be granted only if the petitioner can show that refusal to hear his claims will result in a fundamental miscarriage of justice.[42] The narrow exception for fundamental miscarriages of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is actually innocent of the underlying offense.[43] A claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial."[44]

In the District Court, Petitioner alleged that he was actually innocent based on the affidavit and ultimate evidentiary-hearing testimony of Dr. Uschinski. The District Court properly rejected Petitioner's claim by concluding as follows:

> In support of his claim of innocence, Petitioner presents the affidavit and evidentiary hearing testimony of Dr. Uscinski. Dr. Uscinski testified that the diagnosis of Shaken Baby Syndrome is based upon the misinterpretation of experimental work performed over thirty years ago. He testified that it is impossible to shake a baby hard enough to give it a head injury. It is possible to injure a child by shaking it, but the injuries would be in the nature of a crushed chest or a neck injury. Dr. Uscinski testified that David likely died as a result of a fall, from which he suffered a blunt head injury. David's CT scan revealed that David suffered a skull fracture that extended

---

[42] *Murray*, 477 U.S. at 495.
[43] *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray*, 477 U.S. at 496.
[44] *Schlup v. Delo*, 513 U.S. 298, 324 (1995).

> from one side of his head to the other. The skull fracture was caused by a single impact to the head. In his opinion, the impact could have been caused by a fall of forty inches.
>
> Dr. Uscinski's educational and professional experience is impressive. The Court found his testimony relevant and his conclusions the result of a careful review of David McBain's medical record. There remains, however, considerable evidence implicating Petitioner. Petitioner's account of what transpired on the day of David's injury changed over time. Seven physicians who treated David following this traumatic injury, themselves with impressive educational and professional experience, testified that David's injuries could not have been caused by any of the incidents described by Petitioner. Dr. Uscinski's exculpatory testimony is simply insufficient in the face of this overwhelming testimony to persuade the Court that, in light of this new evidence, no juror, acting reasonably, would have voted to find Petitioner guilty beyond a reasonable doubt.
>
> [R 65, Opinion, pp 17, 24-25].

Pusuant to *Schlup v. Delo*,[45] to meet the extraordinarily high standard for establishing actual innocence, Petitioner must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." And actual innocence "means factual innocence, not mere legal insufficiency."[46] "To be credible, [a claim of actual innocence] requires petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence--that was not presented at trial."[47] Here, Petitioner has made no

---

[45] *Schlup v. Delo*, 513 U.S. 298, 314, 327 (1995).
[46] *Bousley v. United States*, 523 U.S. 614, 623 (1998).
[47] *Schlup*, 513 U.S. at 324.

such showing in this case because testimony such as Dr. Uscinski's would not have exonerated Petitioner where SBS was but one theory as to how the victim died.

As the District Court properly noted, although Dr. Uscinski's professional experience is impressive, there remains considerable evidence implicating Petitioner, including his changing accounts of what occurred on the day in question, as well as the fact that seven physicians who treated the baby after the injuries each testified that the injuries could not have been caused by *any* of the incidents described by Petitioner.

**B. Petitioner's argument is without merit where trial counsel had no plausible basis upon which to mount a *Daubert* challenge, nor to present contrary testimony regarding SBS. Moreover, Petitioner was not prejudiced because the testimony regarding SBS was not the only theory of guilt.**

Even if Petitioner could overcome the procedural default of this claim, his argument is without merit where trial counsel had no basis upon which to mount a *Daubert* challenge, nor to present evidence to contradict the SBS testimony. The District Court held that trial counsel was not ineffective for failing to "discover and explore" the "minority viewpoint" challenging SBS (R 65, Opinion, p 27), but the

court did not separately address Petitioner's *Daubert* argument.[48]

In *Daubert*, the Supreme Court held that, under the *federal* rules of evidence, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."[49] The *Daubert* Court announced a non-exclusive checklist for trial courts to use in assessing the reliability of scientific testimony, including whether the theory or technique was tested and subject to peer review, the known or potential rate of error, and whether the theory or technique is generally accepted within the scientific community.[50]

As an initial matter, trial counsel could not be ineffective for failing to mount a challenge under *Daubert* where such standards for scientific evidence were not incorporated into the Michigan Rules of Evidence (M.R.E.) 702 until

---

[48] Petitioner's claim that the District Court "misunderstood" the *Daubert* aspect of his argument is readily explained. In the petition, Dr. Uscinski's affidavit was utilized to assert that Petitioner was actually innocent of the crime, and as a result any procedural default by Petitioner should be excused. As the discovery evolved in the District Court, Petitioner proceeded to argue that trial counsel was ineffective for failing to obtain an expert such as Dr. Uscinski to testify regarding the controversy surrounding SBS. It now appears that because the District Court determined that counsel was not ineffective for failing to discover and explore the minority viewpoint challenging SBS, Petitioner is asserting that counsel should have challenged the science underlying SBS instead. Although Petitioner raised this point in his post-hearing brief to the District Court, the argument was not separately presented in his petition, nor did Petitioner move to amend his petition at any point to include the argument.

[49] *Daubert*, 509 U.S. at 589.

[50] *Daubert*, 509 U.S. at 593-595.

2004, when M.R.E. 702 was amended to conform to the 2000 amendment to Federal Rules of Evidence 702.[51]

And in any case, even if the *Daubert* factors applied to Petitioner's 1999 trial, he cannot show that, had such a challenge been mounted to the SBS testimony, it would have been successful. Petitioner asserts that "[e]ven at the time of Petitioner's trials prosecutor's [sic] were not allowed to just place any type of expert upon the stand to testify to any type of "unproven" or "untested" theory they chose. Rather, these theories had to be proven theories that were based upon reliable scientific evidence." (Petitioner's Brief, p 25). While Petitioner's point is accurate, it is not well-taken with regard to SBS testimony where such testimony was, and continues to be, widely accepted in criminal trials in Michigan and across the country. Trial counsel was not required to take measures that, ultimately, would have been pointless.[52] Here, it would have been pointless to object to the admission of the SBS testimony.

---

[51] The "Staff Comment" to M.R.E. 702 reads as follows: "The July 22, 2003, amendment of M.R.E. 702, effective January 1, 2004, conforms the Michigan rule to Rule 702 of the Federal Rules of Evidence, as amended effective December 1, 2000, except that the Michigan rule retains the words "the court determines that" after the word "If" at the outset of the rule. The new language requires trial judges to act as gatekeepers who must exclude unreliable expert testimony. See *Daubert v. Merrell Dow Pharmaceuticals, Inc,* 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993) . . ."

[52] *Ludwig v. United States*, 162 F.3d 456, 459 (6th Cir. 1998).

Petitioner also states that "[i]f there was no reliable data concerning SBS prior to 2000 – *as the District Court found to be the case,* then this Court must concede that trial counsel was ineffective . . ." (Petitioner's Brief, p 27 (emphasis added)). This is an inaccurate account of the District Court's findings, for the District Court never said there was "no reliable date concerning SBS prior to 2000," rather, the Court noted that Petitioner failed to show that *criticism* of the science underlying SBS was widespread or widely known at the time of Petitioner's trial, such that trial counsel should have sought such an expert. (R 65, Opinion, p 27). The District Court never held that the data regarding SBS was unreliable at the time of Petitioner's trial. In sum, Petitioner's argument that there was "no empirical data to be relied on in support of the state's experts' opinions regarding SBS" (Petitioner's Brief, p 29) is unsupported.

To the extent Petitioner has asserted that trial counsel was ineffective for failing to present an expert to counter the SBS testimony, such an argument was properly rejected by the District Court. The District Court held that neither trial nor appellate counsel were ineffective for failing to discover the *minority* viewpoint challenging SBS. The District Court's conclusion was based on the following:

> [T]he Court finds that neither trial nor appellate counsel was ineffective in failing to specifically seek to obtain an expert able to testify regarding any controversy surrounding a Shaken Baby Syndrome Diagnosis. It appears that, between the time of Petitioner's

> trials and today, the science underlying Shaken Baby Syndrome has been the subject of some controversy. However, Petitioner has not shown that criticism of the science underlying Shaken Baby Syndrome was so widespread or widely known at the time of Petitioner's trial and appeal that counsel should have sought such an expert. Dr. Uscinski's curriculum vitae lists his first publication or presentation addressing Shaken Baby Syndrome as occurring in September 2000. The two articles cited by Petitioner appeared in late 1998 and early 1999. Thus, it was not unreasonable for trial counsel to have been unaware of them.
>
> Appellate counsel testified that he was unaware of any controversy surrounding Shaken Baby Syndrome at the time of Petitioner's appeal to the Michigan Court of Appeals. While the articles cited by Petitioner were published before the Michigan Court of Appeals issued its decision on direct appeal, by citing two articles, Petitioner has not shown that any controversy surrounding Shaken Baby Syndrome was so widespread that appellate counsel was acting outside the wide range of reasonably competent professional assistance in failing to investigate further. Moreover, the author of one of the papers cited by Petitioner, Dr. John Plunkett, in a subsequent author's note, recognized that his paper questioning Shaken Baby Syndrome represented the minority view. The Court will not try to identify a point in time when the minority view had been voiced a sufficient number of times and in a sufficient number of publications so as to require an attorney, acting competently, to, at a minimum, explore its relevance to a defendant's case. The Court does find that such a critical point had not been reached at the time of Petitioner's trial or appeal.
>
> [R 65, Opinion, pp 26-27].

Finally, even if counsel could have, and therefore should have, presented an expert to challenge the SBS science or testimony at trial, Petitioner cannot show any resulting prejudice. This is because absent *any* testimony regarding whether Petitioner shook a fragile eight-month-old, the jury could separately conclude that

Petitioner deliberately struck the baby's head several times against a flat surface. This case involved a child with a severe skull fracture and fatal injuries, and the issue for the jury to decide was whether the injuries resulted from accidental impacts as described by Petitioner, or whether it resulted from his intentional actions.

As the defense summarized in closing argument to the jury, the prosecution's experts presented "one, two, three, four different opinions here as to the cause of death." (R 32, TT 1485). In other words, this was not a trial where the prosecution's case rested solely on a theory of SBS, for although some of the State's witnesses testified in support of SBS, the prosecution's lead witness and indeed other medical witnesses testified that the death resulted from blunt-force trauma to the baby's head. Accordingly, and for purposes of argument only, taking all of Dr. Uscinski's testimony against SBS as true, such testimony would not have exonerated Petitioner at trial where the prosecution's focus was also on the approximately 11 injuries found on the victim's body, the severe and lengthy fatal fracture to the baby's head, and Petitioner's own statements after the child's death that were wholly inconsistent with his claim of innocence.

The majority of Dr. Uscinski's focus at the evidentiary hearing was on SBS, whether in his opinion it exists, and whether it was the cause of death in this case. Dr. Uscinski opined that a baby can never be shaken to death, and that the child in

this case certainly was not killed as a result of severe shaking. But again, this trial did not turn on the issue of whether SBS is a valid diagnosis, and in fact, defense counsel was able to undermine a diagnosis of SBS at trial. For example, the prosecution's lead witness, Medical Examiner Palutke, did not characterize the child's death as resulting from SBS, but rather, from "blunt force cranial cerebral injuries." (R 31, TT 333). And Dr. Palutke went so far as to state during cross-examination that although there was retinal hemorrhaging, it could have been caused by the blow to the baby's head.[53] (R 31, TT 308).

Accordingly, Petitioner's attempt to establish that he would have been acquitted, but for counsel's failure to present an expert like Dr. Uscinski to challenge the science of SBS, fails because: (a) the jury was aware through other expert witnesses that there were non-SBS explanations for the retinal hemorrhaging and SBS-like symptoms; and (b) the prosecution's theory of the case was primarily focused on the severe skull fracture and additional injuries that were present with this child.

This is not a typical SBS case where an otherwise healthy child, presenting with no other injuries, died in the care of another. Rather, it is undisputed that the

---

[53] Defense counsel also established through the cross-examination of ophthalmologist Stephen Higgins that some of the retinal bleeding in this case could have been caused by the blow that caused the fracture, and Dr. Higgins also testified that there are other causes of retinal bleeding, such as diabetes and the application of CPR, although he did not feel it was the source of the bleeding in this case. (R 33, TT 733-734).

victim was injured while in Petitioner's care, and that the child's skull was severely fractured. This case is different from SBS cases where such testimony comprises an "all or nothing" theory of guilt, and where contrary testimony of an expert might genuinely be of assistance.

## CONCLUSION

For the foregoing reasons, Respondent respectfully requests that this Honorable Court affirm the decision of the District Court.

Respectfully submitted,

Bill Schuette
Attorney General

John J. Bursch
Solicitor General
Co-Counsel of Record

/s/ Laura A. Cook
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Appellate Division
P.O. Box 30217
Lansing, MI 48909
517/373-4875
cookl@michgian.gov

Dated: July 18, 2011

## ADDENDUM – DESIGNATION OF RECORD ON APPEAL

Respondent-Appellee, per Sixth Circuit Rule 28(c), 30(b), hereby designates the following portions of the record on appeal:

| Description of Entry | Date | Record Entry No. |
| --- | --- | --- |
| Petition for Writ of Habeas Corpus | 08/31/2005 | R. 1 |
| Response to Petition for Writ of Habeas Corpus | 06/07/2006 | R. 16 |
| Transcript of Proceedings held on 11/03/1998 | 06/21/2006 | R. 21 |
| Transcript of Proceedings held on 02/19/1999 | 06/21/2006 | R. 27 |
| Transcript of Proceedings held on 02/16/1999 | 06/21/2006 | R. 31 |
| Transcript of Proceedings held on 02/22/1999 | 06/21/2006 | R. 32 |
| Transcript of Proceedings held on 02/18/199 | 06/21/2006 | R. 33 |
| Transcript of Proceedings held on 02/17/1999 | 06/21/2006 | R. 34 |
| Michigan Supreme Court Case No. 119996 | 06/21/2006 | R. 35 |
| Michigan Court of Appeals Case No. 254194 | 06/21/2006 | R. 36 |
| Michigan Supreme Court Case No. 127221 | 06/21/2006 | R. 37 |
| Michigan Court of Appeals Case No. 219434 | 06/21/2006 | R. 38 |
| Motion for Evidentiary Hearing | 09/17/2007 | R. 42 |
| Motion to Appoint F. Martin Tieber | 09/17/2007 | R. 44 |
| Transcript of Evidentiary Hearing held on 11/21/2008 | 12/16/2008 | R. 54 |
| Supplemental Brief – Petitioner’s | 07/16/2009 | R. 62 |

| | | |
|---|---|---|
| Supplemental Brief – Respondent’s | 09/11/2009 | R. 63 |
| Supplemental Brief – Petitioner’s Reply | 09/23/2009 | R. 64 |
| Opinion and Order | 11/05/2009 | R. 65 |

## CERTIFICATE OF COMPLIANCE

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

1. This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains no more that 14,000 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). There are a total of 13,290 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Word 2003 in 14 point Times New Roman.

/s/ Laura A. Cook
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Appellate Division
P.O. Box 30217
Lansing, MI 48909
517/373-4875
cookl@michgian.gov

## PROOF OF SERVICE

I certify that on July 18, 2011, the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by placing a true and correct copy in the United States mail, postage prepaid, to their address of record (designated below).

/s/ Laura A. Cook
Assistant Attorney General
Co-Counsel of Record
Attorneys for Respondent-Appellee
Appellate Division
P.O. Box 30217
Lansing, MI 48909
517/373-4875
cookl@michgian.gov